MATHEWS, SECRETARY OF HEALTH, EDUCA-
TION, AND WELFARE *v.* DIAZ ET AL.

No. 73–1046.  Argued January 13, 1975—Reargued January 12,
1976—Decided June 1, 1976

68

STEVENS, J., delivered the opinion for a unanimous Court.

*Harriet S. Shapiro* reargued the cause for appellant. With her on the brief on reargument were *Solicitor General Bork, Assistant Attorney General Lee,* and *David M. Cohen.* On the brief on the original argument were *Solicitor General Bork, Assistant Attorney General Hills, Gerald P. Norton,* and *Mr. Cohen.*

*Bruce S. Rogow* argued the cause and filed a brief for appellees on reargument. *Alfred Feinberg* argued the cause and filed a brief for appellees on the original argument.*

MR. JUSTICE STEVENS delivered the opinion of the Court.

The question presented by the Secretary's appeal is whether Congress may condition an alien's eligibility for participation in a federal medical insurance program on continuous residence in the United States for a five-year period and admission for permanent residence. The District Court held that the first condition was unconstitutional and that it could not be severed from the second. Since we conclude that both conditions are constitutional, we reverse.

Each of the appellees is a resident alien who was lawfully admitted to the United States less than five years ago. Appellees Diaz and Clara are Cuban refugees who remain in this country at the discretion of the Attorney General; appellee Espinosa has been admitted for per-

---

*Briefs of *amici curiae* urging affirmance were filed by *Jack Wasserman* and *Esther Kaufman* for the Association of Immigration and Nationality Lawyers; by *Robert Allen Sedler* and *Melvin L. Wulf* for the American Civil Liberties Union; by *Jonathan A. Weiss* for Legal Services for the Elderly Poor; and by *Edith Lowenstein* for Migration and Refugee Services, U. S. Catholic Conference, Inc., et al.

manent residence. All three are over 65 years old and have been denied enrollment in the Medicare Part B supplemental medical insurance program established by § 1831 *et seq.* of the Social Security Act of 1935, 49 Stat. 620, as added, 79 Stat. 301, and as amended, 42 U. S. C. § 1395j *et seq.* (1970 ed. and Supp. IV).[1] They brought this action to challenge the statutory basis for that denial. Specifically, they attack 42 U. S. C. § 1395*o* (2) (1970 ed., Supp. IV), which grants eligibility to resident citizents who are 65 or older but denies eligibility to comparable aliens unless they have been admitted for permanent residence and also have resided in the United States for at least five years.[2] Appellees Diaz and Clara meet neither requirement; appellee Espinosa meets only the first.

On August 18, 1972, Diaz filed a class action complaint in the United States District Court for the Southern

---

[1] The Medicare Part B medical insurance program for the aged covers a part of the cost of certain physicians' services, home health care, outpatient physical therapy, and other medical and health care. 42 U. S. C. § 1395k (1970 ed. and Supp. IV). The program supplements the Medicare Part A hospital insurance plan, § 1811 *et seq.* of the Social Security Act of 1935, 49 Stat. 620, as added, 79 Stat. 291, and as amended, 42 U. S. C. § 1395c *et seq.* (1970 ed. and Supp. IV), and it is financed in equal parts by the United States and by monthly premiums paid by individuals aged 65 or older who choose to enroll. 42 U. S. C. § 1395r (b) (1970 ed., Supp. IV).

[2] Title 42 U. S. C. § 1395*o* (1970 ed. and Supp. IV) provides:

"Every individual who—(1) is entitled to hospital insurance benefits under Part A, or (2) has attained age 65 and is a resident of the United States, and is either (A) a citizen or (B) an alien lawfully admitted for permanent residence who has resided in the United States continuously during the 5 years immediately preceding the month in which he applies for enrollment under this part, is eligible to enroll in the insurance program established by this part."

This case does not raise any issues involving subsection (1).

District of Florida alleging that his application for enrollment had been denied on the ground that he was not a citizen and had neither been admitted for permanent residence nor resided in the United States for the immediately preceding five years. He further alleged that numerous other persons had been denied enrollment in the Medicare Part B program for the same reasons. He sought relief on behalf of a class of persons who have been or will be denied enrollment in the Medicare insurance program for failure to meet the requirements of 42 U. S. C. § 1395o (2) (1970 ed., Supp. IV). Since the complaint prayed for a declaration that § 1395o (2) was unconstitutional and for an injunction requiring the Secretary to approve all applicants who had been denied eligibility solely for failure to comply with its requirements, a three-judge court was constituted..

On September 28, 1972, the District Court granted leave to add Clara and Espinosa as plaintiffs and to file an amended complaint. That pleading alleged that Clara had been denied enrollment for the same reasons as Diaz, but explained that Espinosa, although a permanent resident since 1971, had not attempted to enroll because he could not meet the durational residence requirement, and therefore any attempt would have been futile. The amended complaint sought relief on behalf of a subclass represented by Espinosa—that is, aliens admitted for permanent residence who have been or will be denied enrollment for failure to meet the five-year continuous residence requirement—as well as relief on behalf of the class represented by Diaz and Clara.[3]

---

[3] The District Court certified a class and a subclass, defined, respectively, as follows:

"All immigrants residing in the United States who have attained the age of 65 and who have been or will be denied enrollment in the supplemental medical insurance program under Medicare, 42 U. S. C. § 1395j et seq. (1970), because they are not aliens lawfully

On October 24, 1972, the Secretary moved to dismiss the complaint on the ground, among others, that the District Court lacked jurisdiction over the subject matter because none of the plaintiffs had exhausted his administrative remedies under the Social Security Act. Two days later, on October 26, 1972, Espinosa filed his application for enrollment with the Secretary. He promptly brought this fact to the attention of the District Court, without formally supplementing the pleadings.

None of the appellees completely exhausted available avenues for administrative review. Nevertheless, the

---

admitted for permanent residence who have resided in the United States continuously during the five years immediately preceding the month in which they apply for enrollment as required by [42 U. S. C. § 1395o (2) (B) (1970 ed., Supp. IV)].

.      .      .      .      .

"All immigrants lawfully admitted for permanent residence in the United States who have attained the age of 65 and who have been or will be denied enrollment in the supplemental medical insurance program under Medicare, 42 U. S. C. § 1395j et seq. (1970), solely because of their failure to meet the five-year continuous residency requirement of [42 U. S. C. § 1395o (2) (B) (1970 ed., Supp. IV)]." *Diaz* v. *Weinberger*, 361 F. Supp., 1, 7 (1973) (footnote omitted).

These class certifications are erroneous. The District Court did not possess jurisdiction over the claims of the members of the plaintiff class and subclass who "will be denied" enrollment. Those who "will be denied" enrollment, as the quoted phrase is used in the certification, are those who have yet to be denied enrollment by formal administrative decision. See *id.*, at 6–7, and n. 7. But the complaint does not allege, and the record does not show, that the Secretary has taken any action with respect to such persons that is tantamount to a denial. It follows that the District Court lacked jurisdiction over their claims, see *Weinberger* v. *Salfi*, 422 U. S. 749, 764, and that the class and subclass are too broadly defined. In view of our holding that the statute is constitutional, we need not decide whether a narrower class and subclass could have been properly certified.

Secretary acknowledged that the applications of Diaz and Clara raised no disputed issues of fact and therefore the interlocutory denials of their applications should be treated as final for the purpose of this litigation. This satisfied the jurisdictional requirements of 42 U. S. C. § 405 (g). *Weinberger* v. *Salfi,* 422 U. S. 749, 763–767; *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 641 n. 8. The Secretary did not make an equally unambiguous concession with respect to Espinosa, but in colloquy with the court he acknowledged that Espinosa had filed an application which could not be allowed under the statute.[4] The District Court overruled the Secretary's motion to dismiss and decided the merits on cross-motions for summary judgment.

The District Court held that the five-year residence requirement violated the Due Process Clause of the Fifth Amendment [5] and that since it could not be severed from the requirement of admission for permanent residence, the alien-eligibility provisions of § 1395o (2)(B) were entirely unenforceable. *Diaz* v. *Weinberger,* 361 F. Supp. 1 (1973). The District Court reasoned that "even though fourteenth amendment notions of equal protection are not entirely congruent with fifth amendment concepts of due process," *id.,* at 9, the danger of unjustifiable discrimination against aliens in the enactment of welfare programs is so great, in view of their complete lack of representation in the political process, that this federal statute should be tested under the same pledge of equal protection as a state statute. So tested, the court concluded that the statute was invalid because it was not both rationally based and free from invidious discrimination. It rejected the desire to preserve the fis-

---

[4] See *infra,* at 76–77, and n. 11.

[5] "[N]or shall any person . . . be deprived of life, liberty, or property, without due process of law . . . ." U. S. Const., Amdt. 5.

cal integrity of the program, or to treat some aliens as less deserving than others, as adequate justification for the statute. Accordingly, the court enjoined the Secretary from refusing to enroll members of the class and subclass represented by appellees.

The Secretary appealed directly to this Court.[6] We noted probable jurisdiction. *Weinberger* v. *Diaz,* 416 U. S. 980. After hearing argument last Term, we set the case for reargument. 420 U. S. 959. We now consider (1) whether the District Court had jurisdiction over Espinosa's claim; (2) whether Congress may discriminate in favor of citizens and against aliens in providing welfare benefits; and (3) if so, whether the specific discriminatory provisions in § 1395*o* (2)(B) are constitutional.

## I

Espinosa's claim squarely raises the question whether the requirement of five years' continuous residence is constitutional, a question that is not necessarily presented by the claims of Diaz and Clara. For if the requirement of admission for permanent residence is valid, their applications were properly denied even if the durational residence requirement is ineffective.[7] We

---

[6] The Secretary asserted jurisdiction in this Court by direct appeal under 28 U. S. C. §§ 1252, 1253. Since we possess jurisdiction under § 1252, which provides for direct appeal to this Court from a judgment of a federal court holding a federal statute unconstitutional in a civil action to which a federal officer is a party, we need not decide whether an appeal lies under § 1253. *Weinberger* v. *Salfi, supra,* at 763 n. 8.

[7] Diaz and Clara contend that the requirement of lawful admission for permanent residence should be construed so that it is satisfied by aliens, such as they, who have been paroled into the United States at the discretion of the Attorney General. However, such aliens remain in the United States at the discretion of the Attorney General, 8 U. S. C. § 1182 (d)(5), and hence cannot have been "lawfully admitted for permanent residence," as § 1395*o* (2)(B) requires.

must therefore decide whether the District Court had jurisdiction over Espinosa's claim.

We have little difficulty with Espinosa's failure to file an application with the Secretary until after he was joined in the action. Although 42 U. S. C. § 405 (g) establishes filing of an application as a nonwaivable condition of jurisdiction, *Mathews* v. *Eldridge,* 424 U. S. 319, 328; *Weinberger* v. *Salfi,* 422 U. S., at 764, Espinosa satisfied this condition while the case was pending in the District Court. A supplemental complaint in the District Court would have eliminated this jurisdictional issue; [8] since the record discloses, both by affidavit and stipulation, that the jurisdictional condition was satisfied, it is not too late, even now, to supplement the complaint to allege this fact. [9] Under these circumstances, we treat the pleadings as properly supplemented by the Secretary's stipulation that Espinosa had filed an application.

A further problem is presented by the absence of any formal administrative action by the Secretary denying Espinosa's application. Section 405 (g) requires a final decision by the Secretary after a hearing as a prerequisite of jurisdiction. *Mathews* v. *Eldridge, supra,* at 328–330; *Weinberger* v. *Salfi, supra,* at 763–765. However,

---

[8] Fed. Rule Civ. Proc. 15 (d) ; *Security Ins. Co. of New Haven* v. *United States ex rel. Haydis,* 338 F. 2d 444, 447–449 (CA9 1964).

[9] "Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U. S. C. § 1653. Although the defect in Espinosa's allegations must be cured by supplemental pleading, instead of amended pleading, the statutory purpose of avoiding needless sacrifice to defective pleading applies equally to this case. See *Schlesinger* v. *Councilman,* 420 U. S. 738, 744 n. 9; *Willingham* v. *Morgan,* 395 U. S. 402, 407–408, and n. 3. Despite Espinosa's failure to supplement the complaint, the District Court was aware that he had filed his application; since the Secretary stipulated that the application had been filed, the defect in the pleadings surely did not prejudice him.

we held in *Salfi* that the Secretary could waive the exhaustion requirements which this provision contemplates and that he had done so in that case. *Id.*, at 765–767; accord, *Mathews* v. *Eldridge, supra,* at 328–330 (dictum); *Weinberger* v. *Wiesenfeld,* 420 U. S., at 641 n. 8. We reach a similar conclusion here.

The plaintiffs in *Salfi* alleged that their claims had been denied by the local and regional Social Security offices and that the only question was one of constitutional law, beyond the competence of the Secretary to decide. These allegations did not satisfy the exhaustion requirements of § 405 (g) or the Secretary's regulations, but the Secretary failed to challenge the sufficiency of the allegations on this ground. We interpreted this failure as a determination by the Secretary that exhaustion would have been futile and deferred to his judgment that the only issue presented was the constitutionality of a provision of the Social Security Act.

The same reasoning applies to the present case. Although the Secretary moved to dismiss for failure to exhaust administrative remedies, at the hearing on the motion he stipulated that no facts were in dispute, that the case was ripe for disposition by summary judgment, and that the only issue before the District Court was the constitutionality of the statute.[10] As in *Salfi*, this constitutional question is beyond the Secretary's competence. Indeed, the Secretary has twice stated in this Court that he stipulated in the District Court that Espinosa's application would be denied for failure to meet the durational residence requirement.[11] For jurisdictional purposes, we

---

[10] Record on Appeal 224–227. See Memorandum of Law in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment, Record on Appeal 259–260.

[11] Jurisdictional Statement 3 n. 3; Brief for Appellant 5 n. 5. In his Supplemental Brief, filed after our decision in *Salfi*, the

treat the stipulation in the District Court as tantamount to a decision denying the application and as a waiver of the exhaustion requirements. Cf. *Weinberger* v. *Wiesenfeld, supra,* at 640 n. 6, 641 n. 8.

We conclude, as we did in *Salfi,* that the Secretary's submission of the question for decision on the merits by the District Court satisfied the statutory requirement of a hearing and final decision. We hold that Espinosa's claim, as well as the claims of Diaz and Clara, must be decided.

## II

There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law. *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, 48–51; *Wong Wing* v. *United States,* 163 U. S. 228, 238; see *Russian Fleet* v. *United States,* 282 U. S. 481, 489. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection. *Wong Yang Sung, supra; Wong Wing, supra.*

Secretary argues that the District Court did not possess jurisdiction over Espinosa's claim because it was not until after the District Court had issued its injunction that the Secretary resolved an unspecified factual issue presented by Espinosa's application, and that such a belated confirmation that Espinosa's application should be denied could not confer jurisdiction upon the District Court *nunc pro tunc.* Supplemental Brief for Appellant 4, and n. 1. However, the District Court's jurisdiction was not founded upon the Secretary's subsequent confirmation that Espinosa's application should be denied, but rather upon the Secretary's stipulation in the District Court that no factual issues remained, that the case was ripe for disposition by summary judgment, and that the only issue was the constitutionality of the statute. Even though *Salfi* had not been decided when he so stipulated, he is not now free to withdraw his stipulation, and no reason appears why he should be permitted to do so.

The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification. For a host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other;[12] and the class of aliens is itself a heter-

---

[12] The Constitution protects the privileges and immunities only of citizens, Amdt. 14, § 1; see Art. IV, § 2, cl. 1, and the right to vote only of citizens. Amdts. 15, 19, 24, 26. It requires that Representatives have been citizens for seven years, Art. I, § 2, cl. 2, and Senators citizens for nine, Art. I, § 3, cl. 3, and that the President be a "natural born Citizen." Art. II, § 1, cl. 5.

A multitude of federal statutes distinguish between citizens and aliens. The whole of Title 8 of the United States Code, regulating aliens and nationality, is founded on the legitimacy of distinguishing between citizens and aliens. A variety of other federal statutes provide for disparate treatment of aliens and citizens. These include prohibitions and restrictions upon Government employment of aliens, e. g., 10 U. S. C. § 5571; 22 U. S. C. § 1044 (e), upon private employment of aliens, e. g., 10 U. S. C. § 2279; 12 U. S. C. § 72, and upon investments and businesses of aliens, e. g., 12 U. S. C. § 619; 47 U. S. C. § 17; statutes excluding aliens from benefits available to citizens, e. g., 26 U. S. C. § 931 (1970 ed. and Supp. IV); 46 U. S. C. § 1171 (a), and from protections extended to citizens, e. g., 19 U. S. C. § 1526; 29 U. S. C. § 633a (1970 ed., Supp. IV); and statutes imposing added burdens upon aliens, e. g., 26 U. S. C. § 6851 (d); 28 U. S. C. § 1391 (d). Several statutes treat certain aliens more favorably than citizens. E. g., 19 U. S. C. § 1586 (e); 50 U. S. C. App. § 453 (1970 ed., Supp. IV). Other statutes, similar to the one at issue in this case, provide for equal treatment of citizens and aliens lawfully admitted for permanent residence. 10 U. S. C. § 8253; 18 U. S. C. § 613 (2) (1970 ed., Supp. IV). Still others equate citizens and aliens who have declared their intention to become citizens. E. g., 43 U. S. C. § 161; 30 U. S. C. § 22. Yet others condition equal treatment of an alien upon reciprocal treat-

ogeneous multitude of persons with a wide-ranging variety of ties to this country.[13]

In the exercise of its broad power over naturalization

---

ment of United States citizens by the alien's own country. *E. g.*, 10 U. S. C. § 7435 (a); 28 U. S. C. § 2502.

[13] The classifications among aliens established by the Immigration and Nationality Act, 66 Stat. 163, as amended, 8 U. S. C. § 1101 *et seq.* (1970 ed. and Supp. IV), illustrate the diversity of aliens and their ties to this country. Aliens may be immigrants or non-immigrants. 8 U. S. C. § 1101 (a) (15). Immigrants, in turn, are divided into those who are subject to numerical limitations upon admissions and those who are not. The former are subdivided into preference classifications which include: grown unmarried children of citizens; spouses and grown unmarried children of aliens lawfully admitted for permanent residence; professionals and those with exceptional ability in the sciences or arts; grown married children of citizens; brothers and sisters of citizens; persons who perform specified permanent skilled or unskilled labor for which a labor shortage exists; and certain victims of persecution and catastrophic natural calamities who were granted conditional entry and remained in the United States at least two years. 8 U. S. C. §§ 1153 (a) (1)–(7). Immigrants not subject to certain numerical limitations include: children and spouses of citizens and parents of citizens at least 21 years old; natives of independent countries of the Western Hemisphere; aliens lawfully admitted for permanent residence returning from temporary visits abroad; certain former citizens who may reapply for acquisition of citizenship; certain ministers of religion; and certain employees or former employees of the United States Government abroad. 8 U. S. C. §§ 1101 (a) (27), 1151 (a), (b). Nonimmigrants include: officials and employees of foreign governments and certain international organizations; aliens visiting temporarily for business or pleasure; aliens in transit through this country; alien crewmen serving on a vessel or aircraft; aliens entering pursuant to a treaty of commerce and navigation to carry on trade or an enterprise in which they have invested; aliens entering to study in this country; certain aliens coming temporarily to perform services or labor or to serve as trainees; alien representatives of the foreign press or other information media; certain aliens coming temporarily to participate in a program in their field of study or specialization; aliens engaged to be married to citizens; and certain alien employees entering temporarily to continue to render services to the same

and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens. The exclusion of aliens [14] and the reservation of the power to deport [15] have no permissible counterpart in the Federal Government's power to regulate the conduct of its own citizenry.[16] The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is "invidious."

In particular, the fact that Congress has provided some welfare benefits for citizens does not require it to provide like benefits for *all aliens*. Neither the overnight visitor, the unfriendly agent of a hostile foreign power, the resident diplomat, nor the illegal entrant, can advance even a colorable constitutional claim to a share in the bounty that a conscientious sovereign makes available to its own citizens and *some* of its guests. The decision to share that bounty with our guests may take into account the character of the relationship between the alien and this country: Congress may decide that as the alien's tie grows stronger, so does the strength of his claim to an equal share of that munificence.

The real question presented by this case is not whether discrimination between citizens and aliens is permissible; rather, it is whether the statutory discrimination *within* the class of aliens—allowing benefits to some aliens but not to others—is permissible. We turn to that question.

---

employers. 8 U. S. C. § 1101 (a) (15). In addition to lawfully admitted aliens, there are, of course, aliens who have entered illegally.

[14] *Kleindienst* v. *Mandel*, 408 U. S. 753, 765–770.

[15] *Galvan* v. *Press*, 347 U. S. 522, 530–532; *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 584–591.

[16] See *Zemel* v. *Rusk*, 381 U. S. 1, 13–16; *Aptheker* v. *Secretary of State*, 378 U. S. 500, 505–514; *Kent* v. *Dulles*, 357 U. S. 116, 125–130.

## III

For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.[17] Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary. This very case illustrates the need for flexibility in policy choices rather than the rigidity often characteristic of constitutional adjudication. Appellees Diaz and Clara are but two of over 440,000 Cuban refugees who arrived in the United States between 1961 and 1972.[18] And the Cuban parolees are but one of several categories of aliens who have been admitted in order to make a humane response to a natural catastrophe or an international political situation.[19] Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution.[20] The reasons

---

[17] "[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades* v. *Shaughnessy, supra,* at 588–589 (footnote omitted). Accord, *e. g., Kleindienst* v. *Mandel, supra,* at 765–767; *Fong Yue Ting* v. *United States,* 149 U. S. 698, 711–713.

[18] Cuban Refugee Center—Weekly Statistical Report for November 13–17, 1972, App. 40.

[19] See 8 U. S. C. §§ 1153 (a) (7), 1182 (d) (5).

[20] An unlikely, but nevertheless possible, consequence of holding

that preclude judicial review of political questions [21] also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

Since it is obvious that Congress has no constitutional duty to provide *all aliens* with the welfare benefits provided to citizens, the party challenging the constitutionality of the particular line Congress has drawn has the burden of advancing principled reasoning that will at once invalidate that line and yet tolerate a different line separating some aliens from others.    In this case the appellees have challenged two requirements—first, that the alien be admitted as a permanent resident, and, second, that his residence be of a duration of at least five years.    But if these requirements were eliminated, surely Congress would at least require that the alien's entry be lawful; even then, unless mere transients are to be held constitutionally entitled to benefits, *some* durational requirement would certainly be appropriate.    In short, it

that appellees are constitutionally entitled to welfare benefits would be a further extension of similar benefits to over 440,000 Cuban parolees.

[21] "It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibilty of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker v Carr*, 369 U. S. 186, 217.

is unquestionably reasonable for Congress to make an alien's eligibility depend on both the character and the duration of his residence. Since neither requirement is wholly irrational, this case essentially involves nothing more than a claim that it would have been more reasonable for Congress to select somewhat different requirements of the same kind.

We may assume that the five-year line drawn by Congress is longer than necessary to protect the fiscal integrity of the program.[22] We may also assume that unnecessary hardship is incurred by persons just short of qualifying. But it remains true that some line is essential, that any line must produce some harsh and apparently arbitrary consequences, and, of greatest importance, that those who qualify under the test Congress has chosen may reasonably be presumed to have a greater affinity with the United States than those who do not. In short, citizens and those who are most like citizens qualify. Those who are less like citizens do not.

The task of classifying persons for medical benefits, like the task of drawing lines for federal tax purposes, inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line; the differences between the

---

[22] The District Court held that the durational residence requirement was not rationally related to maintaining the fiscal integrity of the Medicare Part B program because the program is financed on a "current cost" basis, half by appropriations from the general revenues and half by premiums from enrolled individuals; because aliens who do not meet the residence requirement would constitute no greater burden on the general revenues than enrolled citizens who have not paid federal taxes or who pay their premiums from federally subsidized welfare benefits; because aliens, like citizens, must pay federal taxes; and because the residency requirement only postpones treatment of aliens until costlier medical care is necessary. *Diaz* v. *Weinberger*, 361 F. Supp., at 10–12.

eligible and the ineligible are differences in degree rather than differences in the character of their respective claims. When this kind of policy choice must be made, we are especially reluctant to question the exercise of congressional judgment.[23] In this case, since appellees have not identified a principled basis for prescribing a different standard than the one selected by Congress, they have, in effect, merely invited us to substitute our judgment for that of Congress in deciding which aliens shall be eligible to participate in the supplementary insurance program on the same conditions as citizens. We decline the invitation.

## IV

The cases on which appellees rely are consistent with our conclusion that this statutory classification does not deprive them of liberty or property without due process of law.

*Graham* v. *Richardson,* 403 U. S. 365, provides the strongest support for appellees' position. That case holds that state statutes that deny welfare benefits to resident aliens, or to aliens not meeting a requirement of durational residence within the United States, violate the Equal Protection Clause of the Fourteenth Amendment and encroach upon the exclusive federal power over the entrance and residence of aliens. Of course, the latter ground of decision actually supports our holding today that it is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens. The equal protection analysis also involves significantly different considerations because it concerns the relationship between

---

[23] *Weinberger* v. *Salfi,* 422 U. S., at 768–774; *Dandridge* v. *Williams,* 397 U. S. 471, 483–487.

aliens and the States rather than between aliens and the Federal Government.

Insofar as state welfare policy is concerned,[24] there is little, if any, basis for treating persons who are citizens of another State differently from persons who are citizens of another country. Both groups are noncitizens as far as the State's interests in administering its welfare programs are concerned. Thus, a division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification, whereas, a comparable classification by the Federal Government is a routine and normally legitimate part of its business. Furthermore, whereas the Constitution inhibits every State's power to restrict travel across its own borders, Congress is explicitly empowered to exercise that type of control over travel across the borders of the United States.[25]

The distinction between the constitutional limits on state power and the constitutional grant of power to the Federal Government also explains why appellees' reliance on *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250, is misplaced. That case involved Arizona's requirement of durational residence within a county in order to receive nonemergency medical care at the

---

[24] We have left open the question whether a State may prohibit aliens from holding elective or important nonelective positions or whether a State may, in some circumstances, consider the alien status of an applicant or employee in making an individualized employment decision. See *Sugarman* v. *Dougall,* 413 U. S. 634, 646–649; *In re Griffiths,* 413 U. S. 717, 728–729, and n. 21.

[25] "State alien residency requirements that either deny welfare benefits to noncitizens or condition them on longtime residency, equate with the assertion of a right, inconsistent with federal policy, to deny entrance and abode. Since such laws encroach upon exclusive federal power, they are constitutionally impermissible." *Graham* v. *Richardson,* 403 U. S. 365, 380.

county's expense. No question of alienage was involved. Since the sole basis for the classification between residents impinged on the constitutionally guaranteed right to travel within the United States, the holding in *Shapiro* v. *Thompson,* 394 U. S. 618, required that it be justified by a compelling state interest.[26] Finding no such justification, we held that the requirement violated the Equal Protection Clause. This case, however, involves no state impairment of the right to travel—nor indeed any impairment whatever of the right to travel within the United States; the predicate for the equal protection analysis in those cases is simply not present. Contrary to appellees' characterization, it is not "political hypocrisy" to recognize that the Fourteenth Amendment's

---

[26] In *Shapiro* v. *Thompson,* we held that state-imposed requirements of durational residence within the State for receipt of welfare benefits denied equal protection because such requirements unconstitutionally burdened the right to travel interstate. Since the requirements applied to aliens and citizens alike, we did not decide whether the right to travel interstate was conferred only upon citizens. However, our holding was predicated expressly on the requirement "that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." 394 U. S., at 629. See *Graham* v. *Richardson, supra,* at 375–376, 377–380.

Appellees also gain no support from *Washington* v. *Legrant,* 394 U. S. 618, a case decided with *Shapiro* v. *Thompson. Legrant* involved a congressionally imposed requirement of one year's residence within the District of Columbia for receipt of welfare benefits. As in *Shapiro* v. *Thompson,* no question of alienage was involved. We held that the requirement violated the Due Process Clause of the Fifth Amendment for the same reasons that the state-imposed durational residency requirements violated the Equal Protection Clause of the Fourteenth Amendment. 394 U. S., at 641–642. Unlike the situation in *Shapiro* and *Legrant,* the durational residency requirement in this case could at most deter only the travel of aliens into the United States. The power of Congress to prevent the travel of aliens into this country cannot seriously be questioned.

limits on state powers are substantially different from the constitutional provisions applicable to the federal power over immigration and naturalization.

Finally, we reject the suggestion that *U. S. Dept. of Agriculture* v. *Moreno,* 413 U. S. 528, lends relevant support to appellees' claim. No question involving alienage was presented in that case. Rather, we found that the denial of food stamps to households containing unrelated members was not only unsupported by any rational basis but actually was intended to discriminate against certain politically unpopular groups. This case involves no impairment of the freedom of association of either citizens or aliens.

We hold that § 1395*o* (2)(B) has not deprived appellees of liberty or property without due process of law.

The judgment of the District Court is

*Reversed.*