**GANADERA INDUSTRIAL, S.A., Plaintiff,**

v.

**John R. BLOCK, et al., Defendants.**

Civ. A. No. 82–2889.

United States District Court, District of Columbia.

Nov. 5, 1982.

· Michael M. Eaton, Washington, D.C., William Bruce Harper, Jr., Miami, Fla., for plaintiff. ·

Stephen E. Hart, Peter W. Waldmeir, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

This case requires the Court to examine the action of the Secretary of Agriculture

in withdrawing a Costa Rican company's privilege to import beef into the United States. The Secretary's action was taken on October 1, 1982, by his authorized delagee, Dr. Donald L. Houston, Administrator of the Department's Food Safety and Inspection Service. The withdrawal of importing privileges was pursuant to regulations[1] implementing the Federal Meat Inspection Act of 1907, 21 U.S.C. § 620, as amended in 1967,[2] an amendment which expanded the Secretary's authority to protect consumers from imported adulterated or misbranded meat.

Ganadera Industrial, S.A. (hereinafter GISA) is a Costa Rican company which has exported large quantities of beef and beef products to the United States since 1967 from its plant at Guanacasta, Costa Rica, known as Establishment # 10. It claims the Secretary acted arbitrarily and capriciously, contrary to the Administrative Procedure Act, and also violated due process by failing to provide notice and hearing in advance of the delisting action. GISA unsuccessfully sought reinstatement by means of a temporary restraining order. Discovery was then expedited and the issues brought on for a prompt trial on the merits. Having heard testimony and oral argument, the Court will enter judgment for the defendants based on findings of fact and conclusions of law set forth below.

Costa Rica has four separate plants that export beef to the United States. While the United States Department of Agriculture occasionally sends its own representatives to examine foreign plants and, of course, all beef shipped from Costa Rica to the United States is examined on a spot-check sampling basis at the port of entry, the Department must rely primarily on the foreign government concerned to ensure the wholesomeness of meat products. The plants are required to be inspected by Costa Rican authorities in accordance with protocols approved by the Department of Agriculture. Regulations governing the health of slaughtered animals, their preparation for shipment, branding and wrapping are detailed and technical. The Department has insisted on precise compliance, refining its requirements in the light of experience, and attempting to preserve the reliability of the process by which beef is processed and shipped. The program is preventive, designed to eliminate the possibility of unwholesome meat coming into this country. There is close cooperation with the Government of Costa Rica, as there is with other countries whose plants are licensed to sell into this country under similar arrangements.

When problems arise because of unsound meat shipments, failure to comply with regulations, or other matters raising questions concerning the integrity of a particular foreign plant's processes or business practices, information developed by the Department's investigations is discussed at a diplomatic level with representatives of the foreign country involved. When a satisfactory resolution of the Department's concerns remains questionable, the Department may take preventive action to protect consumers. The events disclosed by the record in this case reflect this process which has been in effect since 1967 and which is wholly consonant with congressional intent.

The proof developed at trial reflected the Secretary's continuing concern with the adequacy of the entire Costa Rican meat inspection program. Instances of misbranding, adulteration and false certification involving various plants, including GISA's plant, arose repeatedly in 1981 and eventually led to delisting of the entire country and investigation both by the United States and officials of the new Costa Rican Government. Various explanations for the violations, including those involving GISA, were given and fully explored. Regulations and procedures in Costa Rica were tightened. In late March, 1982, the general delisting was lifted and the Costa Rican plants were again permitted to ship beef to the United States.

---

**1.** 9 C.F.R. § 327.2.

**2.** Pub.L. 90–201.

While the Secretary continued to have concerns relating to GISA's management and the accuracy of the explanations given, he was satisfied that the GISA physical plant was operating in accordance with the proper health standards. GISA shipped beef from March until sometime in June, when it traditionally shut down until the dry season was over. Further investigation of GISA by the United States and Costa Rica apparently continued after GISA was restored along with other Costa Rican plants to the list of plants permitted to import.

Based on information he was receiving, Dr. Houston came to believe by September of this year that GISA should be delisted. While GISA's plant was physically in conformity with health requirements, shipments made in 1981 were still under investigation. Moreover, adulterated and misbranded meat had been imported through a Miami concern, no longer in business, that was controlled by Dr. Miguel Rodriquez, who was also chairman of the board and controlling shareholder of GISA. Dr. Rodriquez's activities were under investigation by a federal grand jury on charges which included importation of unwholesome and misbranded meat and use of a counterfeit United States Department of Agriculture "inspected and passed" stamp. When the Department's concerns over the past violations and GISA's connection with Dr. Rodriquez were discussed with Costa Rican authorities in late September, Dr. Houston was advised that Costa Rica had no authority to prevent GISA from continuing to export to the United States. Dr. Rodriquez was indicted in Florida on September 29 and after consulting the Department's General Counsel and being advised he had authority to delist GISA forthwith, Dr. Houston took the delisting action challenged here and notified Costa Rica through diplomatic channels on October 1, 1982. GISA was advised that it would be reinstated if Dr. Rodriquez was completely removed from management and from control of GISA through a voting trust but this condition has not been met.

Section 327.2(a)(3) of 9 C.F.R. provides that the Secretary "may, at his discretion, terminate the eligibility of any foreign establishment for importation of its products into the United States if he has information that such establishment does not comply with the requirements listed in paragraphs (a)(2)(i) and (ii) . . . ." The provisions of paragraphs (a)(2)(i) and (ii) are broad and all-inclusive, requiring the Secretary to be assured that the foreign government is able to control the plant and its product to assure that its beef arriving in the United States meets standards at least as high as those maintained in this country, and consistent with the goals of the Act. This requirement must be read to involve all aspects of meat quality from initial preparation to importation and to the enforcement of standards at least equivalent to those in the United States, and is intended to vest in the Secretary wide discretion to act in protection of consumers unless wholly satisfied that no misbranding or adulteration is likely to occur. The Secretary is charged to act on information before, not after, harm is done. Given the events recited above, and Costa Rica's inability to act, Dr. Houston had reason to believe that GISA's operations lacked the integrity necessary to assure its name would only attach to wholesome products.[3] The delisting of GISA was neither arbitrary nor capricious.

GISA is not entitled to advance notice and hearing where, as in this case, delay in the termination of importing eligibility could result in the importation of adulterated or misbranded meat. 9 C.F.R. § 327.-2(a)(3). Section 671 of 21 U.S.C., on which GISA primarily relies, is not applicable to foreign plants because United States inspectors are not present there on a regular basis as in domestic plants. Nor is there any requirement that citizens and aliens be

---

**3.** Secondarily, Dr. Houston's action was also motivated by the contents of certain confidential diplomatic cables as to which the Secretary of State has formally asserted the state secrets privilege in accordance with *Halkin v. Helms,* 690 F.2d 977, 991 (D.C.Cir.1982). These documents have not been examined by the Court.

treated alike where a legitimate distinction can be made between them. *Mathews v. Diaz,* 426 U.S. 67, 78, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976). In the case of foreign meat establishments licensing is mainly arranged between the governments involved. Under the regulation reasonable notice was given Costa Rica and Costa Rica offers no complaint. Due process does not require prior notice and hearing when factors crucial to the public health require immediate intervention by the state.

This is the first court action challenging an order of the Secretary delisting a foreign plant under the Meat Inspection Act. Since delisting has a severe impact on the plant and affects the economy of Costa Rica, a friendly nation, the Court believes it would be in the interests of all concerned to provide a prompt review of the Secretary's exercise of his discretion. GISA may start shipping again when the Secretary's requirements are met, but his order is upheld.

The Clerk of Court is directed to enter judgment for defendants.