**Rajni J. PATEL, Plaintiff,**

v.

**SUMANI CORP., INC., et al.,
Defendants.**

Civ. A. No. 86–AR–1536–S.

United States District Court,
N.D. Alabama, S.D.

May 27, 1987.

Bob Humphries, Montgomery, Ala., George M. Boles, Birmingham, Ala., for plaintiff.

Joseph L. Boohaker, Birmingham, Ala., for defendants.

George R. Salem, Sol. of Labor, Bobbye D. Spears, Regional Sol., George D. Palmer, Associate Regional Sol., U.S. Dept. of Labor, Birmingham, Ala., for U.S. Dept. of Labor.

## MEMORANDUM OPINION

ACKER, District Judge.

Plaintiff Rajni J. Patel brings this action against defendants Sumani Corp., Inc., d/b/a Quality Inn South, Manibhai Patel and Dilip Patel, seeking to recover alleged unpaid minimum wages, alleged unpaid overtime compensation, and an additional equal amount as liquidated damages, all pursuant to 29 U.S.C. § 216, a provision of the Fair Labor Standards Act of 1938, as amended. Patel would invoke this court's federal question jurisdiction under 28 U.S.C. § 1331. The court has for consideration defendants' motion for summary judgment pursuant to Rule 56, F.R.Civ.P.

### Undisputed Pertinent Facts

Rajni Patel is a lawyer from India. On or about May 12, 1982, Patel was issued a six-week visitor's visa by the United States. On June 1, 1982, Patel arrived in the United States. Patel lived with his cousin who operated the Gaslight Motel while in New Orleans. Patel admits that his visitor's visa expired on or about June 20, 1982, and thereafter that he has remained illegally within this country. On or about July 11, 1983, Patel came to Birmingham, Alabama, and stayed at the Quality Inn South. Defendant Sumani at that time leased and managed the Quality Inn South. Patel claims he came to Birmingham to work for defendants Manibhai and Dilip Patel who are not related to Rajni Patel. Manibhai and Dilip, who at that time were the majority stockholders of Sumani, claim that Patel

was never employed by either them, by the Quality Inn South, or by Sumani, and that they simply permitted Patel to stay at the motel as a favor to Patel's cousin and to hide Patel from the Immigration and Naturalization Service.

While Patel was at the Quality Inn South, he did perform some work for Sumani. Sumani claims that it paid him as an "independent contractor". Neither social security taxes, federal and state taxes nor unemployment compensation taxes were deducted from what Patel was paid. Patel left the Quality Inn South on or about October 27, 1985 and returned to New Orleans. On August 19, 1986 Patel filed this action.

Defendants not only deny Patel's claim on its merits but assert that as an illegal alien Patel has no claim under the FLSA.

### Conclusions of Law

Congress, in the FLSA, as amended, requires every employer engaged in commerce or in the production of goods for commerce to pay each employee a minimum wage as periodically established by Congress. 29 U.S.C. § 206. In addition, Congress requires employers engaged in commerce or in the production of goods for commerce, if they use their employees in excess of forty hours per week, to compensate them at a rate of not less than one and one-half times the regular rate. 29 U.S.C. § 207. Under 29 U.S.C. § 216(b), an employer who violates the provisions of §§ 206 and 207 is "liable to the employee or employees affected in the amount of their unpaid minimum wages or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages". Section 203(e)(1) states that "the term 'employee' means any individual employed by an employer". Defendants do not contest that they would qualify as "employers" under the Act, although each defendant denies that Patel was ever an "employee".

None of the parties to this action has located any decided case that specifically addresses the question presented here, namely, whether or not an illegal and undocumented alien can enforce the minimum wage and overtime provisions of the FLSA while an illegal alien. By order dated March 24, 1987, this court requested that the United States Department of Labor file a statement of position on whether or not an admittedly illegal alien has standing to complain of alleged violations of the wage and hour provisions of the FLSA. The Department of Labor filed its statement of position on April 7, 1987, taking the position that illegal aliens can enforce the wage and hour provisions of the FLSA. In its statement, the Department of Labor cites no case and no legislative history in support of its position. Thereafter, by telephone call to the court's law clerk, the Department of Labor brought to the court's attention *In re Reyes*, 814 F.2d 168 (5th Cir.1987), in which the Fifth Circuit on March 30, 1987 says, *without citing a single authority:*

> [I]t is well established that the protections of the Fair Labor Standards Act are applicable to citizens and aliens alike and whether the alien is documented or undocumented is irrelevant.

814 F.2d at 170.

Judge Edith Jones dissented in *Reyes*. This court agrees with Judge Jones when she says:

> I also take issue with the majority's conclusion that ... the Fair Labor Standards Act do[es] not distinguish between citizens and illegal alien employees. Previously, no court has explicitly permitted an undocumented alien to recover the damages and penalties provided for in th[is] statute[ ].

841 F.2d at 171.

Judge Jones is entirely correct in noting that the majority was taking a position without precedent. Why are there no decided cases on this subject when there have undoubtedly been millions of illegal aliens employed in this country for years at less than the minimum wage? [1] The logical rea-

---

1. "Sheer incapability or lax enforcement of the laws banning entry into this country, coupled

with the failure to establish an effective bar to the employment of undocumented aliens, has

son is that no illegal alien ever entertained the thought he was entitled to invoke the FLSA until the recent era of amnesty, when Patel was emboldened to "come out of the closet," so to speak. It is difficult to think that since the FLSA was adopted years ago no lawyer has ever filed a suit on behalf of an employed illegal alien, that is, unless the multitalented and hungry legal profession unanimously shared the view of Judge Jones.

Another reason for siding with Judge Jones in *Reyes* is that the Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, 100 Stat. 3359 (codified in scattered sections of 8 U.S.C.), provides that undocumented aliens who can demonstrate that they have lived here prior to January 1, 1982, are now eligible for legalization. The Act clearly makes it illegal to hire unauthorized aliens after November 6, 1986, and provides sanctions effective June 1, 1987, against an employer to enforce this provision. An article by Vernon M. Briggs, professor in the New York State School of Industrial and Labor Relations at Cornell University, appearing on the editorial page of The Birmingham News on May 19, 1987, accurately describes the new Immigration Reform and Control Act of 1986 as one which "bans for the first time discrimination in employment against non-citizens". This means, of course, that prior to 1986, non-citizens were discriminated against in employment as a matter of public policy. The pre–1986 interpretation of the FLSA which Patel and the Department of Labor would have this court adopt would surely contradict Dr. Briggs' belief that prior to the new Act aliens were discriminated against in employment.

A rule of statutory construction here applicable is the rule which presumes that new legislation which relates to the subject matter of prior legislation sheds light on the intent of the prior legislation because Congress when it speaks on a particular subject must intend either to harmonize that subject or to change something about the preexisting law relating to it. Otherwise, Congress presumptively would not waste its time dealing with something it has satisfactorily dealt with before. If, prior to the enactment of the IRCA, illegal aliens had all of the protections of the FLSA, there would have been much less of a reason for the IRCA, if any reason at all.

Generally, the question of "standing" involves an analysis of whether or not a litigant has a sufficient stake in an otherwise justiciable controversy to merit his being the one to litigate that controversy. Admittedly, some courts have recognized the right of an illegal or undocumented alien to bring an action in federal court alleging violations of certain federal statutes. *Local 512, Warehouse and Office Workers' Union v. NLRB*, 795 F.2d 705, 718 n. 12 (9th Cir.1986); *see also Moreau v. Oppenheim*, 663 F.2d 1300, 1308 (5th Cir. 1981), *cert. denied*, 458 U.S. 1107, 102 S.Ct. 3486, 73 L.Ed.2d 1368 (1982) ("We seriously doubt whether illegal entry, standing alone, makes outlaws of individuals, permitting their contracts to be breached without legal accountability."); *Martinez v. Fox Valley Bus Lines*, 17 F.Supp. 576 (D.C.Ill.1936) (Illegal alien permitted to sue for negligence to recover for personal injuries). And it is a well-recognized principle that an alien's unlawful, involuntary, or transitory presence in this country does not deprive him of *all* constitutional protections. *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976). In *Diaz*, the Supreme Court concluded that a provision of the Social Security Act which denied eligibility to aliens for supplemental medical insurance unless the aliens were admitted for permanent residence and resided in the United States for at least five years did not violate the due process clause of the Fifth Amendment. As Justice Stevens, in writing for the Court, stated:

resulted in the creation of a substantial 'shadow population' of illegal migrants—numbering in the millions—within our borders. This situation raises the spector of a permanent caste of undocumented resident aliens, encouraged by some to remain here as a source of cheap labor,

but nevertheless denied the benefits that our society makes available to citizens and lawful residents." *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982) (footnotes omitted).

The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause *does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification.* For a host of constitutional and statutory provisions rest on the premise that *a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other;* and the class of aliens is itself a heterogeneous multitute of persons with a wide-ranging variety of ties to this country.

In the exercise of its broad power over naturalization and immigration, *Congress regularly makes rules that would be unacceptable if applied to citizens.* The exclusion of aliens and the reservation of the power to deport have no permissible counterpart in the Federal Government's power to regulate the conduct of its own citizenry. *The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is "invidous."*

In particular, the fact that Congress has provided some welfare benefits for citizens does not require it to provide like benefits for *all aliens. Neither the overnight visitor, the unfriendly agent of a hostile foreign power, the resident diplomat, nor the illegal entrant, can advance even a colorable constitutional claim to a share in the bounty that a conscientious sovereign makes available to its own citizens and some of its guests.* The decision to share that bounty with our guests may take into account *the character of the relationship between the alien and this country.* Congress may decide that as the alien's tie grows stronger, so does the strength of his claim to an equal share of that munificence.

96 S.Ct. at 1890–92 (footnotes omitted).

■ Although the Court in *Diaz* was not concerned with claims brought by an illegal alien, as this court is here, the recognition by the Court of the right of Congress to make distinctions between citizens, legally admitted aliens, and illegal aliens is paramount to this court's consideration of Patel's claim under the FLSA. The fact that the FLSA defines an "employee" as *"any individual* employed by an employer" does not mean that an illegal alien employed by an employer automatically falls within the purview of the FLSA. An illegal alien may be a "person" guaranteed equal protection and due process of law by the Fifth and Fourteenth Amendments, *Plyer v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982); however, he may not be an "individual" protected by the provisions of the FLSA. Many federal statutes make distinctions in their applications as between citizens and aliens, and the FLSA must be construed so as not to conflict with the recent amendments to the INA. *Diaz,* 96 S.Ct. at 1890 n. 12. Congress has now implemented a policy of discouraging the entry and employment in this country of illegal aliens, the previous lack of which was justly criticized by Justice Brennan in *Plyer.* For this court to interpret the protection of the FLSA to apply to illegal aliens would so obviously conflict with the purpose and policy behind the IRCA so as to fly in the face of what Congress has attempted to do. This court concludes, therefore, that Patel is not an "individual" within the definition of an employee under the FLSA. If Patel is not an "individual" under the FLSA, it follows that he has no standing to complain of any violations of the FLSA. *Cf. Coules v. Pharris,* 212 Wis. 558, 250 N.W. 404 (1933) (Illegal alien has no standing to sue on contract).

Assuming *arguendo* that Patel, an admittedly illegal alien, has some sort of minimal "standing" to bring an action in federal court claiming violations of the FLSA, the next question presented by Patel's action is whether Patel, because of his illegal presence in the United States, has the right to *recover* for any alleged violation. This is an allied but a separate question.

In *Sure-Tan, Inc. v. NLRB,* 467 U.S. 883, 894, 104 S.Ct. 2803, 2810, 81 L.Ed.2d 732 (1984), the Supreme Court reasoned that

the National Labor Relations Act applies to illegal or undocumented aliens and protects them from unfair labor practices by an employer. In *Sure-Tan,* the Court found that petitioner employers had engaged in an unfair labor practice by reporting to the Immigration and Naturalization Service certain employees known to be undocumented aliens in retaliation for their engaging in union activities. Writing for the Court, Justice O'Connor considered the potential conflict between the application of the NLRA and the mandate of the Immigration and Naturalization Act:

> *Counterintuitive though it may be,* we do not find any conflict between application of the NLRA to undocumented aliens and the mandate of the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.* This Court has observed that "[t]he central concern of the INA is with the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *De Canas v. Bica,* 424 U.S. at 359, 96 S.Ct. at 938. *The INA evinces "at best evidence of a peripheral concern with employment of illegal entrants." Id.* at 360, 96 S.Ct., at 939. For whatever reason, *Congress has not adopted provisions in the INA making it unlawful for an employer to hire an alien who is present or working in the United States without appropriate authorization.* While it is unlawful to "concea[l], harbo[r], or shie[l]d from detection" any alien not lawfully entitled to enter or reside in the United States, see 8 U.S.C. § 1324(a)(3), an explicit proviso to the statute explains that "employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." *Ibid.* See *De Canas v. Bica, supra,* at 360, and n. 9, 96 S.Ct., at 939, and n. 9. Moreover, Congress has not made it a separate criminal offense for an alien to accept employment after entering this country illegally. See 119 Cong. Rec. 14184 (1973) (remarks of Rep. Dennis). *Since the employment relationship between an employer and an undocumented alien is hence not il-*

*legal under the INA, there is no reason to conclude that application of the NLRA to employment practices affecting such aliens would necessarily conflict with the terms of the INA.*

We find persuasive the Board's argument that enforcement of the NLRA with respect to undocumented alien employees is compatible with the policies of the INA. *A primary purpose in restricting immigration is to preserve jobs for American workers; immigrant aliens are therefore admitted to work in this country only if they "will not adversely affect the wages and working conditions of the workers in the United States similarly employed."* 8 U.S.C. § 1182(a)(14). See S.Rep. No. 748, 89th Cong., 1st Sess., 15 (1965), U.S.Code Cong. & Admin.Serv. 1965, p. 3328. *Application of the NLRA helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of employment. If an employer realizes that there will be no advantage under the NLRA in preferring illegal aliens to legal resident workers, any incentive to hire such illegal aliens is correspondingly lessened. In turn, if the demand for undocumented aliens declines, there may then be fewer incentives for aliens themselves to enter in violation of the federal immigration laws. The Board's enforcement of the NLRA as to undocumented aliens is therefore clearly reconcilable with and serves the purposes of the immigration laws as presently written.*

104 S.Ct. at 2809–10 (emphasis supplied). The Court, relying principally on *De Canas v. Bica,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), and the immigration laws in force at that time, found no conflict between application of the NLRA to illegal aliens and the mandate of the INA.

In the present action, however, this court is concerned not with the NLRA but with the application of the wage and overtime provisions of the FLSA. As noted, the

immigration laws have recently been amended by the IRCA. On November 5, 1986, the IRCA became effective. It amended the INA to revise and reform the immigration laws so as to provide for the control of illegal immigration through employment restrictions and the granting of amnesty to certain qualified illegal aliens. Patel does not claim that he falls within the amnesty provisions of the IRCA. He conspicuously does not invoke the new Act.

Section 274A was added to the INA, making the employment of unauthorized aliens unlawful. The statute provides in part:

(1) In general

It is unlawful for a person or other entity to hire, or to recruit or refer for a fee, for employment in the United States—

(A) an alien knowing the alien is an unauthorized alien (as defined in subsection (h)(3) of this section) with respect to such employment, or

(B) an individual without complying with the requirements of subsection (b) of this section.

(2) Continuing employment

It is unlawful for a person or other entity, after hiring an alien for employment in accordance with paragraph (1), to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.

\* \* \* \* \* \*

(4) Use of labor through contract

For purposes of this section, a person or other entity who uses a contract, subcontract, or exchange, entered into, renegotiated, or extended after the date of the enactment of this section, to obtain the labor of an alien in the United States knowing that the alien is an unauthorized alien (as defined in subsection (h)(3) of this section) with respect to performing such labor, shall be considered to have hired the alien for employment in the United States in violation of paragraph (1)(A).

8 U.S.C. § 1324a(a) (Supp.1987).

An unauthorized alien is defined as follows:

As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act or by the Attorney General.

8 U.S.C. § 1324a(h)(3) (Supp.1987).

Thus, the Court's reasoning in *Sure-Tan* was not only. "counterintuitive" or contrary to what naturally may be divined from the policy and purposes behind the INA, but the INA *now* evinces a foremost concern with the employment of illegal aliens. The INA now provides for criminal and civil sanctions against an employer who knowingly hires or recruits for employment an illegal alien. Furthermore, the statute makes it illegal for an employer to continue to employ the alien in the United States knowing the alien is or has become an unauthorized alien with respect to such employment. Subsection (a)(4) also prohibits employers from circumventing the provisions of the statute by contracting with illegal aliens as so-called "independent contractors". Moreover, the INA is amended to add section 274B which deals with unfair immigration-related employment practices. This provision specifically excludes from coverage discrimination in employment by employers against unauthorized aliens. Under these amendments to the INA, there is no doubt now but that the employment relationship between an employer and an undocumented alien is *illegal* under the INA, and there *is* reason to conclude that the application of the wage and overtime provisions of the FLSA to illegal aliens conflicts with the terms of the INA.

■ The IRCA now places an affirmative duty on employers to verify the employment eligibility of all applicants by checking certain documents. 8 U.S.C. § 1324a(b) (Supp.1987). No longer can any court say that "private persons such as petitioners [employers] have no judicially cognizable interest in procuring enforcement of the immigration laws by the INS."

104 S.Ct. at 2811. Contrary to the court's reasoning in *Sure-Tan* concerning the application of the NLRA, not only is the conclusion that the FLSA cannot be enforced by an illegal alien intuitive from the policy behind the INA, given the goals sought to be achieved by the IRCA, but such a conclusion appears to be mandated by Congress. As the court noted in *Sure-Tan,* "[a] primary purpose [of the federal government] in restricting immigration is to preserve jobs for *American* workers...." (emphasis supplied). The purpose behind the INA amendments is to discourage not only illegal aliens from seeking employment in the United States, but also to punish employers for employing illegal or undocumented aliens. The IRCA was intended to remove an economic incentive for illegal entry into the United States for the purpose of engaging in unlawful employment and to correct a policy in the past of allowing illegal aliens the full protection of all laws designed to protect workers legally within this country. Thus, the IRCA was designed to correct or ameliorate those provisions of the INA which in effect condoned and encouraged undocumented aliens to enter this country to work. This court's decision holding that an illegal alien cannot obtain a remedy for violations by his employer of the provisions of the FLSA is fully consistent with the objectives of federal immigration law as now amended. Such a holding by this court significantly furthers the goal of the INA of discouraging illegal immigration and has no adverse effect on laborers legally employed in this country. *Cf. Immigration and Naturalization Service v. National Center for Immigrants' Rights,* — U.S. ——, 107 S.Ct. 1881, 95 L.Ed.2d 489 (April 20, 1987) (Court vacates Ninth Circuit decision striking down INS regulation conditioning bond release on aliens refraining from "unauthorized work" and orders court to reconsider in light of the IRCA.).

Consistent with this court's reasoning, many cases have held that it is entirely appropriate for the federal and state governments to place work disabilities on illegal or undocumented aliens. In *De Canas v. Bica,* 424 U.S. 354, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), the Court found that a California statute prohibiting an employer from knowingly employing an alien not entitled to lawful residence in the United States was not unconstitutional as being preempted under the supremacy clause by the INA. Justice Brennan, writing for the court, recognized the vital state interests sought to be protected by the California statute:

> Employment of illegal aliens in times of high unemployment deprives citizens and legally admitted aliens of jobs; acceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens; and employment of illegal aliens under such conditions can diminish the effectiveness of labor unions. These local problems are particularly acute in California in light of the significant influx into the State of illegal aliens from neighboring Mexico. In attempting to protect California's *fiscal interests and lawfully resident labor force from the deleterious effects on its economy resulting from the employment of illegal aliens, § 2805(a) focuses directly upon these essentially local problems and is tailored to combat effectively the perceived evils.*

96 S.Ct. at 937 (emphasis supplied).

The same state interests expressed in *Bica* are also sought to be protected by Congress through its enactment of the IRCA. The employment of illegal aliens deprives the lawfully resident labor force of jobs and has a harmful effect on the national economy. Enforcing the minimum wage and hour provisions of the FLSA in favor of an illegal alien encourages the alien illegally to obtain entry into the United States and to work here. On the other hand, not allowing an illegal alien to enforce the wage and hour laws discourages such entry and has no detrimental effect on the employment of citizens and aliens legally admitted into the United States. By enacting the IRCA, Congress evidenced its belief that the employment of illegal aliens adversely affects the wages and working

conditions of workers legally in the United States. Given the criminal and civil sanctions imposed on employers under the IRCA, there is no advantage or incentive for employers to prefer illegal aliens over legal resident workers, whereas giving illegal aliens rights under the FLSA encourages their illegal entry since the only penalty they can suffer is deportation. Denying illegal aliens a remedy under the provisions of the FLSA not only discourages their entry and recognizes the policy and goals of the INA, but it also indirectly penalizes their criminal conduct. *Cf. INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984) ("[E]ntering or remaining unlawfully in this country is itself a crime."); *Plyer v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 2388, 72 L.Ed.2d 786 (1982) ("Unsanctioned entry into the United States is a crime....").

In *Bica* the court implicitly acknowledged that the trend in recent years was to restrict the employment rights of illegal aliens:

> Finally, rather than evidence that Congress "has unmistakably ... ordained" exclusivity of federal regulation in this field, there is evidence in the form of the 1974 amendments to the Farm Labor Contractor Registration Act, 88 Stat. 1652, 7 U.S.C. § 2041 *et seq.* (1970 ed., Supp. IV), that Congress intends that States may, to the extent consistent with federal law, regulate the employment of illegal aliens. Section 2044(b) authorizes revocation of the certificate of registration of any farm labor contractor found to have employed "an alien not lawfully admitted for permanent residence, or who has not been authorized by the Attorney General to accept employment." Section 2045(f) prohibits farm labor contractors from employing "an alien not lawfully admitted for permanent residence or who has not been authorized by the Attorney General to accept employment." Of particular significance to our inquiry is the further provision that "[t]his chapter and the provisions contained herein are *intended to supplement State action* and compliance with this chapter shall not excuse anyone from compliance with *appropriate State law and regulation.*" 7 U.S.C. § 2051 (emphasis supplied). Although concerned only with agricultural employment, the Farm Labor Contractor Registration Act is thus persuasive evidence that the INA should not be taken as legislation by Congress expressing its judgment to have uniform federal regulations in matters affecting employment of illegal aliens and therefore barring state legislation such as § 2805(a).

*Id.* 96 S.Ct. at 939–40 (emphasis in original).

The enactment of the IRCA indicates that Congress believes the problem of illegal aliens working in the United States now requires uniform national rules. While potentially preempting state regulation of the employment of illegal aliens such as the Court was concerned with in *Bica*, the amended INA evinces a policy of discouraging the employment of illegal aliens. To enforce the minimum wage and overtime provisions of the FLSA in favor of an alien illegally working in the United States is a direct and unquestionable conflict with this INA policy.

Patel is a lawyer. He is familiar with the English common law tradition. Patel necessarily understands the illegality of his presence within this country. He is here because he can make more money working as a laborer below minimum wage in a motel in the United States than he can practicing law in India. It is clear that Patel is challenging the ability of this country to enforce its own immigration laws. For aught appearing, Patel has not sought legal entry. Patel now asks this court to help him to perform a fraud upon the American labor force by frustrating the plain purpose of the INA to discourage the illegal entry into this country of aliens seeking work. Such assistance by this court, if it should award the same protections under the FLSA to illegal aliens that are guaranteed workers legally within this country, would effectively repudiate the policy and purpose behind the recent amendments to the INA.

Patel has offered nothing whatsoever in response to defendants' motion for summary judgment as he is required to do under *Celotex Corp. v. Catrett,* — U.S. —, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

For the reasons stated, defendants' motion for summary judgment is due to be granted.

An appropriate separate order will be entered.