Lawton M. CHILES, Jr., et al., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants.

No. 94–0676–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Dec. 20, 1994.

Parker D. Thomson, Special Asst. Atty. Gen., Miami, FL, Louis F. Hubener, Ana Cristina Martinez, Asst. Atty. Gen., Office of the Atty. Gen., Tallahassee, FL, Phyllis Douglas, Miami, FL, Robert Blake, Jackson Memorial Hosp., Miami, FL, for plaintiffs.

Dexter Lee, Asst. U.S. Atty., Miami, FL, David J. Anderson, Thomas Millet, Civ. Div., Dept. of Justice, Washington, DC, for defendants.

## ORDER ON MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

EDWARD B. DAVIS, District Judge.

THE IMMIGRATION CRISIS that is currently facing the United States has culminated in the filing of this action. This problem is not new. As the then-President Ronald Reagan proclaimed in 1981:

> The ongoing migration of persons to the United States in violation of our laws is a serious national problem, detrimental to the interests of the United States. A particularly difficult aspect of the problem is the continuing illegal migration by sea of large numbers of undocumented aliens to the Southeastern United States. These arrivals have severely strained the law enforcement resources of the Immigration and Naturalization Service and have threatened the welfare and safety of communities in that region.

Proclamation No. 4865, 46 Fed.Reg. 48,107 (1981). The costs of this continuing influx of aliens are disproportionately concentrated in only a few states,[1] including Florida.[2]

## BACKGROUND AND SUMMARY OF THE COMPLAINT

On April 11, 1994, Lawton M. Chiles, Jr., the State of Florida, the Dade County Public Health Trust, and the School Board of Dade County, Florida ("Plaintiffs") filed suit against the United States of America and several individual officers of the United States. The Plaintiffs' grievances with the United States are based on allegations that the United States has failed to properly enforce immigration policies, thereby causing the State of Florida to incur disproportionate

---

1. The seven states with the largest numbers of undocumented aliens are: California, Florida, Texas, New York, Illinois, Arizona, and New Jersey. The Urban Institute, *Fiscal Impacts of Undocumented Aliens: Selected Estimates for Seven States,* September, 1994.

2. In a report funded by the Department of Justice entitled *Fiscal Impacts of Undocumented Aliens: Selected Estimates for Seven States,* the Urban Institute analyzed the impact that undocumented aliens were having on seven states in-

cluding Florida. The report estimated that Florida's undocumented alien population as of October 1992, was approximately 322,000 or 2.3% of the total population of Florida. The report estimated Florida's annual expenditures for (1) public schools for undocumented aliens in 1993–94 was $424 million; (2) emergency services under Medicaid for undocumented aliens in 1993 was $22.5—$29.1 million; and (3) incarcerating illegal aliens in 1994 will be $11.8 million. *Id.* at 5, 8, 11, and 13.

and unfair expenses in educating and providing other public benefits to aliens.[3] Plaintiffs apparently realize the difficulty in having this Court mandate that the executive branch of the United States enforce immigration laws; however, they still contend that "a mandatory injunction requiring defendants to make payments under statutes mandating the provision of financial assistance is well within the power of this Court...." (Complaint ¶ 14). They urge this Court to grant them relief because they have no other avenue in which to obtain a remedy:

> Plaintiffs have no administrative remedy to pursue, to influence or to change the decisions and policies of defendants, which decisions and policies permit and cause a massive and uncontrolled influx of aliens, including undocumented aliens, to enter and remain in the United States and the State of Florida.

(Complaint ¶ 61). They further argue that the political process cannot provide them with help:

> The national political process has provided no adequate safeguard against this discrimination. The costs imposed by the continuing influx of aliens on state and local governments are disproportionately concentrated in only a few states, including Florida. Representatives of other states have a political incentive to ignore such costs, or to provide only small and thus far ineffective tokens of assistance, rather than ensure that they are borne equitably. Accordingly, unless this Court grants appropriate relief, the State of Florida and the other plaintiffs will continue to incur and have to pay such costs as are described herein in the future.

(Complaint ¶ 64).

The complaint alleges four counts. In Count I, Plaintiffs allege that they are entitled to grants from an Immigration Emergency Fund administered by the Attorney General of the United States, and they ask the Court to direct that Defendants develop a plan to disburse that fund. *See* 8 U.S.C. § 1101 (1993). As relief, Plaintiffs demand that the Attorney General of the United States grant the State of Florida its share of the emergency funds. (Complaint ¶ 72).

In Count II of the complaint, Plaintiffs allege that, under 8 U.S.C. § 1103, Defendants have failed to "enforce and administer the immigration laws or to accept the financial responsibility for such failure." (Complaint ¶ 76). Plaintiffs also frame this cause of action under 5 U.S.C. § 702 and 5 U.S.C. § 706. Plaintiffs allege that they have no choice but to pay the cost of the Defendants' failure to enforce the immigration laws and that failure to absorb the costs would cause Florida to suffer injury through "increased crime, disease, illness, homelessness, and the many problems presented by an uneducated or poorly educated populace." (Complaint ¶ 77). Plaintiffs argue that instead of forcing Defendants to properly enforce the immigration laws, the problem could be "alleviated by an ongoing restitution to Plaintiffs of the prospective costs imposed on them by the Federal Abdication and Default Policy." (Complaint ¶ 81).

Count III challenges the operation of two federal programs, Medicaid and Aid for Families with Dependent Children ("AFDC"). Both programs have provisions limiting the payment of federal funds to certain aliens.[4] Plaintiffs argue that the State of Florida is disproportionately affected by these restrictions because of the large number of aliens that live in Florida, and therefore ask the Court to order Defendants to provide these services. They allege that it "is arbitrary, irrational, and unconstitutional for Defendants not to provide Medicaid and AFDC assistance to Florida on the same basis that

---

**3.** The Plaintiffs complain about the expenses they are forced to incur on behalf of both legal and illegal aliens, arguing that even many legal aliens are not self-sufficient members of the community and that the state is forced to provide for these persons basic education, immunization from contagious diseases, food, housing, public transportation, and health care. (*See, e.g.,* Complaint ¶¶ 47, 51).

**4.** Under AFDC, benefits are provided to citizens or "an alien lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law...." 42 U.S.C. § 602(a)(33).

other states are assisted. That basis is *need.*" (Complaint ¶ 87). Plaintiffs argue: The defendants' failure to compensate the plaintiffs for making need-based payments to aliens, while assisting virtually all other states with virtually all of their expenditures to provide need-based medical care and aid to families with dependent children, effectively penalizes plaintiffs for having a needy population that is disproportionately comprised of aliens, largely as a result of defendants' Federal Abdication and Default Policy.

(Complaint ¶ 89). Plaintiffs also allege that Defendants are in violation of Article IV, § 4 and Article I, § 8 of the Constitution. (Complaint ¶¶ 90, 91).

Count IV of the complaint alleges that the Defendants have imposed the financial burdens of immigration on the State of Florida thereby violating the Guarantee and Invasion Clauses of Article IV of the Constitution and the Tenth Amendment by requiring Florida to provide social welfare services to these immigrants. (Complaint ¶¶ 97, 98). Plaintiffs allege that the failure to properly enforce the immigration laws has resulted in an "invasion" of the State of Florida by aliens and has "seriously impaired the constitutional guarantee of a republican form of government." (Complaint ¶ 97). As in Count II, rather than asking the Court to force the executive to enforce the immigration laws, Plaintiffs ask the Court to grant a mandatory injunction requiring the Defendants to pay restitution until the immigration laws are enforced properly. (Complaint ¶ 104).[5]

## STANDARD OF REVIEW

The Defendants seek dismissal of the entire complaint under Federal Rule of Civil Procedure 12(b)(6). To state a claim, Federal Rule of Civil Procedure 8(a) requires, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." The Court must "take the material allegations of the complaint and its incorporated exhibits as true, and liberally construe the complaint in favor of the Plaintiff." *Burch v. Apalachee Community Mental*

*Health Services, Inc.,* 840 F.2d 797, 798 (11th Cir.1988) (citation omitted), *aff'd,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The law in this Circuit is well-settled that "the 'accepted rule' for appraising the sufficiency of a complaint is 'that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief'." *SEC v. ESM Group, Inc.,* 835 F.2d 270, 272 (11th Cir.) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2822, 100 L.Ed.2d 923 (1988). The moving party bears a heavy burden. *St. Joseph's Hospital, Inc. v. Hospital Corp. of America,* 795 F.2d 948, 953 (11th Cir.1986).

## PARTIES ARGUMENTS AND COURT'S DECISION

The Defendants present three general arguments in support of dismissal of all four counts of the complaint in the aggregate. Then, they discuss the complaint count by count, urging that each count in the complaint fails to state a claim in its own right.

### A. Count I

■ Before addressing Defendants' general arguments, the Court will address a new development as it relates to Count I. As stated earlier, in Count I, Plaintiffs allege that they are entitled to grants from an Immigration Emergency Fund administered by the Attorney General of the United States, and they ask the Court to direct that the Defendants develop a plan to disburse that fund. *See* 8 U.S.C. § 1101 (1993).

In 1986, Congress authorized a continuing annual appropriation of $35 million to be used to reimburse states for costs incurred in meeting immigration emergencies. In 1990, Congress adopted an amendment to 8 U.S.C. § 1101 which allowed the Attorney General to disburse up to $20 million of this $35 million annually to states without the President's declaration of an immigration emergency. In 1991, the Attorney General was directed to promulgate regulations governing

---

5. The Plaintiffs argue that counts I and III of the complaint are sustainable under existing law but admit that counts II and IV would require this Court to extend the law as it currently exists.

the process by which states could be reimbursed with the appropriated funds. *See* Pub.L. 102–140, Title VI, § 610, 105 Stat. 832.

Although Proposed Immigration Emergency Fund Rules were first published on January 14, 1992, final rules were not adopted until June 14, 1994, subsequent to the filing of this lawsuit. *See* 59 Fed.Reg. 30520 (June 14, 1994). These Final Rules were not adopted until eight years after the $35 million was allocated to reimburse states, four years after the Attorney General was given permission to disburse the funds, and three years after the Attorney General was directed to promulgate regulations for the disbursement of these funds.[6]

As these Rules have recently been promulgated, Plaintiffs have not been able to demonstrate that they have sought relief under the Rules.[7] Until such time as Plaintiffs have sought and been denied relief pursuant to these new rules, this Count is not ripe for the Court's review and must be dismissed.

### B. The General Arguments

The Defendants' three general arguments are as follows: (1) that the entire complaint presents a political question or dispute that is not justiciable; (2) that the Plaintiffs have no standing to bring suit because they have not alleged and cannot allege that the Defendants are the direct cause of their injuries; and (3) that all counts in the complaint except Count I must be dismissed because the Defendants are immune from suit and have not waived their sovereign immunity.

*Political Question*

Defendants' first argument is that the entire complaint presents a political question or dispute that is not justiciable. They argue that the complaint goes to (1) Congress's choices in allocating resources, and (2) the Executive's enforcement of the laws, neither of which are justiciable.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Soc.,* 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986). The Judiciary is not suited to make such decisions because courts are ill equipped to set national policies or define standards for matters that are not legal in nature. *Id.* (citation omitted). To determine "whether a question falls within the political question category, the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations."[8] *Baker v. Carr,* 369 U.S. 186, 209, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962) (quotation omitted).

Defendants argue that this controversy is a policy dispute between the State of Florida and the Federal Government over the proper allocation of federal resources and the execution of discretionary policies. Thus, the case presents a non-justiciable political question inappropriate for judicial resolution because it requires the Court to adjudicate in areas of

---

**6.** An old Florida Cracker saying, "the old hecoon walks just before the light of day," has received a substantial amount of publicity lately in the State of Florida. It is possible that the current Attorney General, a lifelong Florida resident, understands Cracker and realized that the sun was about to rise and, therefore, issued the final Immigration Emergency Fund Rules.

**7.** The Court expects that the Attorney General will make an expedient determination as to whether an immigration emergency exists and, if so, will diligently disburse any available funds to those states disproportionately affected by the continuing influx of aliens.

**8.** As the Supreme Court stated in *Baker v. Carr:*

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710.

foreign policy, national defense, immigration and the allocation of federal resources. Additionally, Defendants assert that the Court is unable to compensate the State of Florida because of the Court lacks a definable standard for evaluation of Plaintiffs' claims that the federal enforcement of immigration laws is inadequate and, therefore, should be left to the other branches of the Federal Government to resolve.

■ It is undisputed that the Federal Government's control over immigration is plenary. "The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government." *Truax v. Raich,* 239 U.S. 33, 42, 36 S.Ct. 7, 11, 60 L.Ed. 131 (1915) (citation omitted). The Supreme Court, in *Faillo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), stated that " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Id.* at 792, 97 S.Ct. at 1478, *citing Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909). But in *Baker v. Carr,* the Supreme Court carefully pointed out that not every matter touching on politics falls under the political question doctrine. 369 U.S. at 211, 82 S.Ct. at 707 (1969). Specifically, it is "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.*

The Court shall address the political question doctrine in terms of each count of the Complaint.

*a. Count II*

Count II is based on the failure of the Federal Government to enforce and effectively administer immigration laws. In essence, Plaintiffs are seeking an order of the Court requiring the United States to cease its policy of "arbitrary and irrational non-enforcement" of the immigration laws or to provide equitable restitution in the alternative. Plaintiffs claim that the Attorney General is abusing her discretion in failing to enforce immigration laws. Plaintiffs admit that ordering a broad-scale injunction against the United States to enforce the immigration laws may well be beyond the competence of the Court as it would involve the Court in matters relating to the conduct of foreign relations and the deployment of the military forces of the United States. (Complaint, ¶ 14). The Court agrees and will therefore restrict its discussion to Plaintiffs' alternative ground for relief, equitable restitution.

■ Plaintiffs allege that in Count II they are is only asking that the Court exercise its inherent authority of statutory interpretation to determine whether the United States is fulfilling its statutory duty to the State of Florida. Plaintiffs allege that the Attorney General has an obligation to deport illegal aliens under 8 U.S.C. § 1103. This section, which pertains to the powers and duties of the Attorney General, states in part:

(a) Attorney General

... He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the Service as to him shall appear necessary and proper....

8 U.S.C. § 1103 (1993). Plaintiffs claim that the Attorney General has in essence abdicated this responsibility.

Plaintiffs assert that the present case is analogous to *Japan Whaling Ass'n v. American Cetacean Soc.,* 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), in that both cases require the court to interpret a statute that has political overtones. In *Japan Whaling,* the petitioners sought an injunction requiring the Secretary of Commerce to certify to the President that Japan, in its whale harvesting, was diminishing the effectiveness of the International Whaling Commission quotas. Title 22, section 1978 of the United States Code specifically states that "[w]hen the Secretary of Commerce determines that nationals of a foreign country ... are conducting fishing operations in a manner or under circumstances which diminish the effectiveness of an international fishery conservation program, the Secretary of Commerce *shall* certify such fact to the President." 22 U.S.C. § 1978. The Supreme Court concluded that it was within the its authority to determine whether 22 U.S.C. § 1978 imposed

a duty upon the Secretary, as this was simply a matter of statutory interpretation. The Supreme Court recognized that *Baker* authorizes courts to interpret congressional legislation. *Id.* at 230, 106 S.Ct. at 2866.

In the present case, Plaintiffs are asking the Court to review the overall immigration policy of the United States and decide if the Attorney General's failure to deport illegal aliens is a violation of 8 U.S.C. § 1103. Plaintiffs argue that section 1103 imposes on the Attorney General an affirmative duty to deport all illegal aliens. The Court does not find 8 U.S.C. § 1103 to be analogous to the statute referred to in *Japan Whaling* that imposes a specific duty, in that section 1103 allows for the Attorney General's discretion in determining whether to deport an illegal alien. Rather, in reviewing 8 U.S.C. § 1103, the Court finds it to be analogous to the duty imposed on each United States attorney under 28 U.S.C. § 547. Section 547 states in part:

> Except as otherwise provided by law, each United States attorney, within his district, shall—
>
> > (1) prosecute for all offenses against the United States; ...

28 U.S.C. § 547 (1993). Although § 547 appears to require each United States attorney to prosecute all offenses against the United States, no such duty exists. It is well established that the Executive Branch, and therefore the United States Attorney, has exclusive authority and absolute discretion to decide whether to prosecute a case. *United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974). *See also Confiscation Cases,* 7 Wall. 454, 19 L.Ed. 196 (1869). This recognition of prosecutorial discretion is attributable in no small part to the general unsuitability for judicial review of the attorney's decision to refuse to prosecute. *See Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

■ Like 28 U.S.C. § 547, the Court concludes that the Attorney General's decisions under 8 U.S.C. § 1103 not to deport are unsuitable for review. A decision of this sort requires a complicated balancing of factors which are peculiarly within the Attorney General's expertise. The Attorney General

must consider many factors including whether deportation best fits the agency and the Federal Government's overall policies, and whether the political climate of an alien's native country makes deportation unsuitable. Thus, the Court finds the Attorney General's decision not to deport presumptively immune from judicial review. *See Heckler,* 470 U.S. at 831–32, 105 S.Ct. at 1655–56.

In *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), the Supreme Court defined circumstances in which judicial review of agency inactions is appropriate. *Heckler* dealt with the Federal Drug Administration's refusal to take enforcement action concerning the use of certain drugs. The Supreme Court concluded that under 5 U.S.C. § 701(a)(2) there is a presumption of unreviewability of an agency's decision not to undertake enforcement action. This presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers. *Id.,* 470 U.S. at 832–33, 105 S.Ct. at 1656. In a footnote to its opinion, the Supreme Court stated that it expressed no opinion on whether, where an agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities, such decisions are unreviewable under § 701(a)(2). The Court stated that in those situations the statute conferring authority on the agency might indicate that such decisions were not "committed to agency discretion." *Id.* fn. 4.

In the instant case, Florida alleges that the Attorney General's inaction has resulted in an abdication of her statutory responsibility. As stated in *Heckler,* under 5 U.S.C. § 701(a)(2) there is a presumption of unreviewability of the Attorney General's decision not to undertake enforcement action. Florida has failed to identify any guidelines contained in the statutes that would rebut this presumption.

As for Florida's allegation that there has been an abdication of the Attorney General's responsibility, the Court can identify nothing in 8 U.S.C. § 1103, which confers the power to enforce the immigration laws, that would indicate that the Attorney General's decision

not to undertake enforcement action in certain situations is not "committed to agency discretion." *Id.* fn. 4. Therefore, the Court must dismiss Count II.

### b. *Count III*

In Count III, Plaintiffs seek either declaratory relief or damages. Plaintiffs request that the Court declare the current restrictions against providing Medicaid and AFDC benefits to illegal aliens either contrary to applicable statutes or unconstitutional for failing to provide payments to Florida for expenses on behalf of aliens.[9] Plaintiffs base this claim on the Tenth Amendment[10] and the Guarantee Clause[11] of the United States Constitution alleging that the Federal Government's policies disproportionately affect Florida, thus rendering the State of Florida politically isolated and powerless. Plaintiffs seek a declaration that the restrictions are unconstitutional or, in the alternative, ask the Court to require that the Federal Government pay for expenses incurred for Medicaid and AFDC to illegal aliens.

■ The Federal Government's decision not to provide Medicaid or AFDC to illegal aliens is based on the Federal Government's powers over naturalization and immigration,

and spending.[12] The Supreme Court stated in *Mathews v. Diaz:*

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than the Judiciary.... Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with greatest caution.

*Mathews v. Diaz,* 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976) (footnotes omitted).

■ The Federal Government has determined that it would not be in the United States' best interest to provide Medicaid and AFDC to illegal aliens.[13] It is not difficult to comprehend the rationale behind this decision; to provide these benefits would create additional incentives for illegal immigration

---

**9.** Medicaid is authorized under 42 U.S.C. § 1396b and implemented under 42 C.F.R. §§ 435.406 and 435.408. AFDC is authorized under 42 U.S.C. § 202 and implemented pursuant to 45 C.F.R. §§ 233.50, 233.51 and 233.52.

The foregoing provisions prohibit reimbursing states for any expenses incurred on behalf of an alien not having a specified "lawful status." Medicaid reimbursement for illegal aliens is limited to "emergency medical conditions," as defined in 42 U.S.C. § 1396b(v)(3). Similarly, states may not be reimbursed for providing AFDC coverage to an alien, no matter how impoverished, unless the alien has a recognized lawful status. *See* 42 U.S.C. § 602(a)(33). Hence, the welfare needs of the hundreds of thousands present in Florida who have no lawful status must be met with other funds by state and local governments.

**10.** The Tenth Amendment to the Constitution of the United States of America states:

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

U.S. Const. amend. X.

**11.** The Guarantee Clause, Article IV, Section 4 of the United States Constitution provides:

The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic violence.

U.S. Const. art. IV, § 4.

**12.** Article I, Section 8 of the United States Constitution sets out the Federal Government's spending powers; this provision states:

The Congress shall have Power To lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States.

U.S. Const., Art. I, § 8.

**13.** This case demonstrates that what may be in the best interests of the United States, can be devastating to individual states, in this case, the State of Florida.

into the United States. This could have a serious and substantial impact on this country's immigration and naturalization scheme as well as on the nation's relationships with foreign countries. If the Court were to order the Federal Government to reimburse the states for the Medicaid and AFDC costs, the Court would be intruding into the realm of foreign policy, an arena in which the Judiciary does not belong.

In addition, it is well settled that the power of the Federal Government to spend is limited only by the requirement that such power shall be exercised to provide for the general welfare of the United States. *United States v. Butler*, 297 U.S. 1, 65–6, 56 S.Ct. 312, 319, 80 L.Ed. 477 (1936). Once the Federal Government determines that it is in the best interest of the United States not provide these benefits to illegal aliens, the Court's inquiry must end.[14]

The State of Florida chose to participate in both Medicaid and AFDC. *See* 42 U.S.C. §§ 601, 1396 (1991). As a condition of participation, the State of Florida must abide by the conditions of the programs, including the lack of funding for illegal aliens.[15]

The Court finds that there is a textually demonstrable constitutional commitment of the issue of whether to provide Medicaid and AFDC benefits to illegal aliens to the Legislative and Executive branches of the Federal Government. Thus, this issue presents a political question, and, therefore, must be dismissed.

### c. Count IV

Count IV is for declaratory and injunctive relief for violation of Plaintiff's rights under Article IV, Section 4 of the United States Constitution and the Tenth Amendment. Plaintiffs assert that the Federal Government's failure to protect the State of Florida against invasion of illegal aliens "has brought coercive pressure to bear on the state and local political processes to provide education, welfare and medical care to these aliens,"[16] and "blurred lines of political accountability" in violation of the Tenth Amendment and the Guarantee Clause of the Constitution.[17] (D.E. 53, p. 10). In essence, Plaintiffs claim that the Federal Government's failure to control the influx of illegal aliens into the State of Florida prevents the government of Florida from functioning in a democratic way.[18] Thus, Plaintiffs ask the

14. In their response to the motion to dismiss, Plaintiffs assert that "Congress is not spending for the *general* welfare when it funds these programs for some but not all of the states on the basis of need." (D.E. 53, p. 47.) As already stated, decreasing the incentive for the continued flow of illegal aliens into the United States is within the "general welfare" of the United States.

15. Plaintiffs make an additional argument that as a result of the Federal Government's policy not to provide Medicaid and AFDC benefits to illegal aliens, the State of Florida is bearing an unfair burden. Plaintiffs allege that although the statute is neutral on its face, there is an uneven impact in Florida due to the disproportionate presence of illegal aliens in Florida.

Plaintiffs assert that within the Tenth Amendment and Guarantee Clause is a requirement that all states be treated equally. (D.E. 53, p. 47.) It is clear from the facts that the Federal Government refuses to provide Medicaid and AFDC to *all* illegal aliens no matter what state the illegal aliens are from. The fact that the results of the policy have a greater affect on the State of Florida, than on other states, does not create an actionable claim.

To illustrate this point, if tomorrow the Federal Government decided to discontinue all wheat subsidies to all farmers in the United States, the

impact of this change in policy would obviously have a its greatest impact on the midwestern states. Although the midwestern states would be called upon to bear a much greater burden, this does not make the policy of no wheat subsidies unconstitutional.

16. Due to the continuing influx of aliens, heavy burdens are placed on Florida's available resources. Among the continuing costs are those of public infrastructure improvements, housing, feeding, medical care, education, incarceration, and parole and probation supervision.

17. Under the Tenth Amendment, "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York v. U.S.*, — U.S. ——, ——, 112 S.Ct. 2408, 2417, 120 L.Ed.2d 120 (1992).

18. Plaintiffs assert that "Florida's lack of any means to protect itself against the ever increasing demands together with defendants' denial of financial assistance has extinguished the lines of political accountability...." (D.E. 53, p. 42). Plaintiffs claim that Federal officials remain in-

Court to order that Defendants terminate the policies that have subjected Florida to an invasion of aliens or requests equitable restitution.

Defendants argue that this count is barred by the political question doctrine as there exists no judicially manageable standard "for which the Court can determine at what point the migration becomes an invasion or when the social costs of migration somehow invade [the State of Florida's] sovereignty." (D.E. 73, p. 9). Defendants argue that without such a standard, Count IV presents a political question for which the Court lacks jurisdiction. *See Nixon v. U.S.,* — U.S. —, —, 113 S.Ct. 732, 735, 122 L.Ed.2d 1 (1993) ("the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch").

The Supreme Court has repeatedly stated that "[p]rominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it ..." *Matthew v. Diaz,* 426 U.S. 67, 83, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976); *Baker,* 369 U.S. at 217, 82 S.Ct. at 710.

Plaintiffs claim that the Supreme Court, in *New York v. U.S.,* sets out a judicially manageable standard that should be applied to this cause of action. Plaintiffs claim that the "government breaches its duty when its failure to protect against invasion of illegal aliens imposes coercive pressure on the state and local political processes, and blurs lines of political accountability to such a degree as to infringe on the sovereignty interests protected by the Tenth Amendment under such cases as *New York v. United States.*" (D.E. 53). The Court does not find this to be a manageable standard when applied to the instant case.

In *New York,* the Supreme Court was faced with determining whether federal legislation which required states to adopt regulations for the disposal of radioactive wastes, 42 U.S.C. § 2021(d)(2)(C), took away political accountability to such an extent as to infringe on the sovereign powers of the states. The Supreme Court concluded that the Federal Government's mandate that states adopt legislation diminished the accountability of the state government to its electorate and therefore violated the Tenth Amendment.

Justice O'Connor, writing for a six Justice majority, drew a careful distinction between Congress' "substantial powers to govern the Nation directly, including in areas of intimate concern to the States," and the prohibited "ability to require the States to govern according to Congress' instructions." *New York,* — U.S. at —, 112 S.Ct. at 2421. Justice O'Connor emphasized that "even when Congress has the authority to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *Id.* at —, 112 S.Ct. at 2423. The Supreme Court concluded that even though Congress has the power to regulate the disposal of radioactive waste, Congress does not have the power to order the states to adopt legislation to regulate in this area. *Id.* at —, 112 S.Ct. at 2429. Thus, the Supreme Court declared 42 U.S.C. § 2021(d)(2)(C) unconstitutional.

The distinction between *New York* and the present case is that, in *New York,* Congress ordered the states to adopt specific policies. In the instant case, Congress has adopted the policies themselves and did not order any action on the part of the states. Congress did not command that the State of Florida do anything. In fact, there is no specific legislation at issue. That Florida has chosen to provide certain services to aliens is not a result of an order from Congress, but a conscious policy choice on behalf of the State of Florida.[19] As the instant case does not

sulated from the consequences of their policies, while Florida elected officials are forced to shape their agendas based on federal priorities and not those of their constituents. (D.E. 53, p. 43.)

**19.** The Court acknowledges Plaintiffs' argument that any choice Florida has is, in essence, a

Hobson's choice. The State of Florida is presented with the following dilemma: If Florida chooses to not to provide services to illegal aliens including closing schools, emergency rooms, etc., the impact on the health, safety and welfare of its citizenry could be potentially devastating. If, on the other hand, Florida chooses to provide the

involve a situation where Congress has ordered legislative action on the part of the states, the standard set out in *New York* is not appropriate.

The Plaintiffs fail to suggest, and the Court is unable to identify, a manageable standard for determining when the migration, as well as the costs associated with such migration, reaches the point at which it invades the State of Florida's state sovereignty. In order to grant the restitution requested by Plaintiffs, the Court would be forced to review the United States entire enforcement of Federal immigration laws including the enforcement methods used and their effectiveness, determine the reasonableness of budget allocations, determine whether more resources are available and, if so, decide how those addition resources should be allocated. The Court is unable to identify satisfactory criteria for making these determinations.[20] This is clearly beyond the Judiciary's authority, and should be left to the Legislative and Executive branches of government.

The Court recognizes that the State of Florida is suffering under a tremendous financial burden due to the methods in which the Federal Government has chosen to enforce the immigration laws. The State of Florida is in desperate need of relief from this overwhelming burden it is being unfairly forced to bear. The Court also recognizes that, as the State of Florida has already sought relief through the political process,

the State may have no other method for obtaining relief from this burden should this Court determine that the issue is a political question. But recognizing these facts does not create a *legal* theory under which this Court may grant relief. Without such a *legal* theory, this Court must dismiss this action.[21]

Accordingly, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss is **GRANTED.** It is

**FURTHER ORDERED AND ADJUDGED** that Plaintiff's Motion for Mandatory Injunction as to Count I and for Partial Summary Judgment Requiring Such Mandatory Injunction is **DENIED as MOOT.**

This case is **DISMISSED.** All pending motions not otherwise ruled upon are **DENIED as MOOT.**

**DONE AND ORDERED.**

---

services, the cost of these services could cripple the State of Florida.

**20.** Plaintiffs rely on *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), for support for their contention that the Federal Government should bear the costs associated with illegal aliens. In *Plyler*, the Supreme Court was faced with the issue of whether the individual states could deny elementary education to children who were illegal aliens. The Supreme Court concluded that, under the Fourteenth Amendment, states could not refuse elementary education to illegal alien children.

In a dissenting opinion, joined by Justices White, Rehnquist and O'Connor, Justice Burger recognized the financial burden that this decision would place on the states. Justice Burger stated that:

It does not follow, however, that a state should bear the costs of educating children whose illegal presence in this country results from the

default of the political branches of the Federal Government. A state has no power to prevent unlawful immigration, and no power to deport illegal aliens; those powers are reserved exclusively to Congress and the Executive. If the Federal Government, properly charged with deporting illegal aliens, fails to do so, it should bear the burdens of their presence here.

*Id.* at 242, 102 S.Ct. at 2408, n. 1 (Burger, J., dissenting). Although this Court agrees with the rationale employed by Justice Burger in his dissenting opinion, to date, neither this Court nor the Supreme Court has been able to identify a judicially manageable standard under which a court could order the Federal Government to bear the costs associated with the mass influx of illegal aliens.

**21.** As the Court has determined that this action is barred by the political question doctrine, the Court need not address Defendants' additional arguments.