

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-29-1996

# State of NJ v. United States

Precedential or Non-Precedential:

Docket 95-5685

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"State of NJ v. United States" (1996). *1996 Decisions.* Paper 123.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/123

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 95-5685


STATE OF NEW JERSEY; CHRISTINE TODD WHITMAN;
WILLIAM H. FAUVER; LEO KLAGHOLZ,

                                    Appellants
                    v.

UNITED STATES OF AMERICA; JANET RENO;
DORIS MEISSNER; ALICE M. RIVLIN


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 94-cv-03471)


Argued May 24, 1996

Before:  SLOVITER, Chief Judge, Sarokin
and Oakes, Circuit Judges

(Opinion Filed July 29, 1996)


Deborah T. Poritz
  Attorney General of New Jersey
Joseph L. Yannotti
Jerry Fischer   (Argued)
Andrew Sapolnick
Office of Attorney General of New Jersey
Trenton, N.J.  08625

        Attorneys for Appellants


Frank W. Hunger
  Assistant Attorney General
Faith S. Hochberg
  United States Attorney
Mark B. Stern  (Argued)
Ellen D. Katz
United States Department of Justice
Washington, DC  20530-0001

        Attorneys for Appellees

OPINION OF THE COURT


SLOVITER, Chief Judge.

I.

FACTS

The State of New Jersey, its governor, Christine Todd Whitman, Corrections Commissioner William H. Fauver and Education Commissioner Leo Klagholz (collectively New Jersey or the state) have sued the United States, Attorney General Janet Reno, Commissioner of the Immigration and Naturalization Service Doris Meissner, and Director of the Office of Management and Budget Alice Rivlin (collectively the United States) seeking compensation for costs incurred by New Jersey in incarcerating and educating illegal aliens.

New Jersey alleges that "[a]s a direct result of the federal government's failure to control its international borders and implement and abide by its laws, the State of New Jersey is improperly forced to bear the financial and administrative costs of imprisonment of illegal aliens who are convicted of crimes in New Jersey . . .[as well as the] costs of education of illegal aliens." App. at 25. These costs for state fiscal year 1994 (ending June 30, 1994) are alleged to have been approximately $50.5 million for incarceration, App. at 26, and approximately $162 million for education, App. at 27. New Jersey seeks a declaratory judgment that it has a right to reimbursement of these costs from the federal government, and an injunction and/or writ of mandamus requiring defendants to disburse funds from the United States Treasury to the state for these costs.

New Jersey grounds its eight count complaint on the following statutory and constitutional provisions: sections of the Immigration Reform and Control Act of 1986 providing for the collection of penalties and expenses by the Attorney General and the reimbursement of states by the Attorney General for costs incurred for the imprisonment of illegal aliens convicted of state felonies, 8 U.S.C.   1330, 1365(a); the Invasion and Guarantee Clauses of Article IV,   4 of the U.S. Constitution; the Tenth Amendment; the Naturalization Clause of Article I,   8; the Takings Clause of the Fifth Amendment; and generalized principles of state sovereignty.

The district court granted the United States' motion to dismiss under Fed.R.Civ.P. 12(b)(6), ruling that New Jersey's constitutional claims presented nonjusticiable political questions and that its statutory claims were not subject to judicial review under the Administrative Procedures Act.  This appeal followed.  We have jurisdiction under 28 U.S.C.   1291 and our review is plenary.

II.

                              DISCUSSION
        We note at the outset that five other states have also
filed similar actions.  Each case has been dismissed by the
district court under Fed.R.Civ.P. 12(b)(6) and in each of the two
cases so far to have reached the appellate courts, the respective
court of appeals has affirmed the dismissal.  See Texas v. United
States, No. B-94-228 (S.D. Tex. Aug. 7, 1995), appeal pending,
No. 95-40721 (5th Cir.); Arizona v. United States, No. 94-0866
(D.Ariz. Apr. 18, 1995), appeal pending, No. 95-15980 (9th Cir.);
Padavan v. United States, No. 94-CV-1341 (N.D.N.Y., Apr. 18,
1995), affirmed, 82 F.3d 23 (2d Cir. 1996); California v. United
States, No. 94-0674-K (S.D.Cal. Mar. 3, 1995), appeal pending,
No. 95-55490 (9th Cir.); Chiles v. United States, 874 F.Supp.
1334 (S.D.Fla. 1994), affirmed, 69 F.3d 1094 (11th Cir. 1995),
cert. denied, 116 S.Ct. 1674 (1996).
                                 A.
                        Constitutional Claims
        Plaintiffs present a number of novel constitutional
claims.  We have considerable doubt as to whether these claims
are even colorable, but, in any event, we agree with the district
court's conclusion that they are non-justiciable.  Nonetheless,
we examine each claim briefly in turn before considering the
political question doctrine.
1. Tenth Amendment
        In its oral argument, New Jersey placed its principal
focus on the Tenth Amendment.  In its complaint, New Jersey
alleges that "[b]y forcing the taxpayers of the State of New
Jersey to absorb the costs of incarcerating and educating illegal
aliens, the United States . . . has usurped the taxpayers of the
State of New Jersey of their rights, under the Tenth Amendment,
to determine the manner in which their tax funds and State
resources are expended."  App. at 31.
        The Tenth Amendment makes explicit a fundamental
precept of the governmental structure defined by our
Constitution: that the federal government's powers are limited to
those enumerated.  Thus, those "powers not delegated to the
United States by the Constitution, nor prohibited by it to the
States, are reserved to the States respectively or to the
people." U.S. Const. amend. X.
        As interpreted by the Supreme Court, the federal
government, which has considerable power to regulate individuals
directly and to encourage states to adopt certain legislative
programs by, for example, attaching conditions to the receipt of
federal funds, cannot require the states to govern according to
its instructions.  Thus "Congress may not simply 'commandee[r]
the legislative processes of the States by directly compelling
them to enact and enforce a federal regulatory program.'"  New
York v. United States, 505 U.S. 144, 161 (1992) (quoting Hodel v.
Virginia Surface Mining & Reclamation Assn., Inc., 452 U.S. 264,
288 (1981)).
        In the decision in New York, the Court held that a
federal statute that required states either to regulate the
disposal of radioactive waste pursuant to Congress' direction or
take title and possession of radioactive wastes generated within

their borders "crossed the line distinguishing encouragement from coercion." 505 U.S. at 175. Either option -- whether adoption of Congress' regulatory scheme or taking title to radioactive wastes -- required a state to govern according to Congress' instructions. Because either option standing alone would be beyond Congress' authority, "it follows that Congress lacks the power to offer the States a choice between the two." Id. at 176.

In contrast, here the federal government has issued no directive to the State of New Jersey. Neither the state's incarceration of illegal aliens nor its obligation to educate illegal aliens results from any command by Congress. The state has made its own decision to prosecute illegal aliens for acts they committed in violation of New Jersey's own criminal code and its education of illegal aliens does not derive from any Congressional or executive directive, but from the Constitution itself, as construed by the Supreme Court in Plyer v. Doe, 457 U.S. 202, 230 (1982).

The state seeks to add another link to the causal chain, asserting that it is not simply the state's criminal code or its constitutional obligations that have caused it to make the large expenditures it complains of, but rather the federal government's failure to adequately enforce the immigration laws. But no precedent suggests that inaction by Congress or the Executive Branch constitutes the kind of coercion that violates the Tenth Amendment. As defendants succinctly state in their brief, "[t]he Tenth Amendment provides a shield against the federal exercise of powers reserved to the states, not a sword to compel federal action." Appellees' Brief at 25. See Padavan, 82 F.3d at 28-29 (rejecting similar Tenth Amendment claim by New York State).

2. Naturalization Clause

One of Congress' specifically enumerated powers under Article I, section 8 of the Constitution is "To establish an uniform Rule of Naturalization." Count VI of the complaint alleges that because power over immigration matters has thus been delegated to the federal government, "the State of New Jersey is powerless to effectively resolve the economic problems caused by the invasion of illegal immigrants into the State," and it further alleges that defendants, in failing to implement their laws and policies, have "forced the State of New Jersey, to bear the burden of a responsibility which is that of the Nation as a whole pursuant to [the Naturalization Clause]." App. at 33.

Beyond its conclusory statement that "[t]his encroachment upon the resources of the State of New Jersey is constitutionally violative and impermissibly infringes upon the fundamental right of the State to determine proper allocation of its resources," id., New Jersey offers no reason why Congressional action pursuant to a power delegated to Congress by the Constitution that results in the indirect imposition of some cost on the states is an unconstitutional infringement on state sovereignty. Such an argument is even more tenuous in light of the Court's decision in Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528 (1985), where the Court upheld the imposition of minimum wage and overtime requirements of the

Fair Labor Standards Act on a local public mass-transit authority, a far more direct congressional imposition of cost. It follows that there is no basis for a claim that the Constitution has been violated by the federal government's inaction, which allegedly has set in motion events that have indirectly caused the state to incur costs. See Padavan, 82 F.3d at 26-27 (rejecting same claim by New York). In light of the Supreme Court's reluctance to read affirmative governmental duties into the Constitution, see, e.g., DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189 (1989), we see no ground on which we could read into the Naturalization Clause an affirmative duty on the part of the federal government to protect states from harm caused by illegal aliens, who are non-governmental third parties.

3. Takings Clause

In one of its separate counts, New Jersey alleges that the federal government, by forcing the state to expend state tax funds and revenues to incarcerate and educate illegal aliens, has taken its property without just compensation in violation of the Takings Clause of the Fifth Amendment.

Although New Jersey correctly notes that the Takings Clause has been construed to apply to the federal government's condemnation of land owned by state and local governments, United States v. 50 Acres of Land, 469 U.S. 24, 31 (1984), it cites no case that has extended that holding to encompass government action or inaction which has an adverse impact on a state's tax revenues.

The Supreme Court has avoided expounding any "set formula" for determining when governmental action constitutes a taking, instead "engag[ing] in . . . essentially ad hoc, factual inquiries," Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992) (quoting Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978)). Relevant considerations include "[t]he economic impact of the regulation on the claimant and . . . the extent to which the regulation has interfered with distinct investment-backed expectations." Penn Central, 438 U.S. at 124. Also relevant is the nature of the action, such as whether it is a physical invasion of land and thus more likely to constitute a taking, or a "public program adjusting the benefits and burdens of economic life to promote the common good," which ordinarily will not be compensable. Id. The Court has made clear that "government may execute laws or programs that adversely affect recognized economic values," id., and has thus "dismissed `taking' challenges on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute `property' for Fifth Amendment purposes." Id. at 124-25.

We have no hesitancy in concluding that the federal government's alleged failure to stem the tide of illegal immigrants into the State of New Jersey, while it may have had the incidental effect of causing the state to incur additional law enforcement and education costs, did not interfere with the state's "investment-backed" and "reasonable expectations" and

thus is not a taking of state property for purposes of the Fifth Amendment.

4. Invasion Clause

In Count III New Jersey alleges that the failure of the United States to prevent the entry of illegal aliens into that state violates the federal government's obligation under the Constitution to "protect each of [the states] against Invasion." U.S. Const. art. IV, 4. It offers no support whatsoever for application of the Invasion Clause to this case or for its reading of the term "invasion" to mean anything other than a military invasion. See Padavan, 82 F.3d at 28 ("In order for a state to be afforded the protections of the Invasion Clause, it must be exposed to armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government." (citing The Federalist No. 43 (James Madison))).

Although it is not entirely clear from either its complaint or brief, the state also appears to be including in the same count a claim under the Guarantee Clause of Article IV, 4. That clause provides that "The United States shall guarantee to every State in this Union a Republican Form of Government," and may be implicated by New Jersey's allegation that "the sovereignty and independence of the State of New Jersey has been contravened" because of the actions (or inaction) of the federal government. App. at 30. New Jersey's complaint makes no specific allegation indicating how the state's republican form of government is threatened or compromised by defendants' actions (or inaction), and certainly the fact that the state "has been forced to increase and expend state taxes," App. at 29, cannot be said to "pose any realistic risk of altering the form or the method of functioning of [the state's] government," see New York, 505 U.S. at 186.

5. Intrusion into Fundamental Sovereignty of State

Without citing to any particular constitutional provision, New Jersey makes the generalized claim that the Constitution "provides, with certain well-defined exceptions, that the federal government may not intrude on the fundamental sovereignty of a State" and that defendants have violated this principle by "failing to implement and enforce its laws," permitting "the invasion of illegal aliens into the State," and refusing "to provide reimbursement for the cost of incarcerating and educating them." App. at 32. This claim adds nothing to the claims we have already found to be without merit. We note the applicability of the Supreme Court's observation that "[s]tate sovereign interests . . . are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power." Garcia, 469 U.S. at 552.

6. Absence of remedy through the political process

Finally, in another claim not grounded in any particular constitutional provision, New Jersey asserts it is entitled to judicial relief because it "has no remedy through the political process established by the Constitution of the United States to seek reimbursement," and "has exhausted all other

political and practical remedies, and any further efforts would be futile."  App. at 34-35.  Presumably the state is alluding to the Supreme Court's statement in South Carolina v. Baker, 485 U.S. 505 (1988), that its previous opinion in Garcia had "left open the possibility that some extraordinary defects in the national political process might render congressional regulation of state activities invalid under the Tenth Amendment."  Id. at 512.  In view of the absence of any allegation that New Jersey "was deprived of any right to participate in the national political process or that it was singled out in a way that left it politically isolated and powerless," id. at 513, New Jersey has alleged no viable claim.

7. Political Question Doctrine

The district court held that all of New Jersey's constitutional claims were nonjusticiable under the political question doctrine.  In Baker v. Carr, 369 U.S. 186 (1962), the Supreme Court identified six factors, any one of which indicates the presence of a political question.  In this case, the district court found at least three of these factors were present: 1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department," 2) "a lack of judicially discoverable and manageable standards for resolving it," and 3) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government."  Id. at 217.

As to the first factor referred to above, even though not "every case or controversy which touches foreign relations lies beyond judicial cognizance," id. at 211, we agree with the Second Circuit that the Naturalization Clause represents "a textually demonstrable constitutional commitment" of immigration to the legislative branch.  Padavan, 82 F.3d at 27.

The second factor cited by the district court finds support in the Supreme Court's cases that "'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"  Fiallo v. Bell, 430 U.S. 787, 792 (1977) (quoting Shaughnessy v. Mezei, 345 U.S. 206, 210 (1953)).  As the Court has explained:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.  Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.

Mathews v. Diaz, 426 U.S. 67, 81 (1976) (footnote omitted).

Finally, each of New Jersey's claims asserted under the Constitution would require a court to evaluate the formulation and implementation of immigration policy by the executive branch.

Decisions about how best to enforce the nation's immigration laws in order to minimize the number of illegal aliens crossing our borders patently involve policy judgments about resource allocation and enforcement methods.  Such issues fall squarely within a substantive area clearly committed by the Constitution to the political branches; they are by their nature peculiarly appropriate to resolution by the political branches of government both because there are no "judicially discoverable and manageable standards for resolving" them and because independent resolution of such issues by a court would express a lack of the respect due a coordinate branch of government.  Baker, 369 U.S. at 217.

Accordingly, we see no error in the district court's dismissal of plaintiffs' constitutional claims as non-justiciable.  Our holding is consistent with those of the other courts of appeals dismissing similar claims on this ground.  SeePadavan, 82 F.3d at 27-28 (Guarantee and Naturalization Clauses); Chiles, 69 F.3d at 1097 (Invasion and Guarantee Clauses and Tenth Amendment).

## B.
## Statutory Claims

New Jersey asserts, in addition, several statutory claims.  It alleges that defendants have violated 8 U.S.C. 1365(a), which provides: "Subject to the amounts provided in advance in appropriation Acts, the Attorney General shall reimburse a State for the costs incurred by the State for the imprisonment of any illegal alien or Cuban national who is convicted of a felony by such State."  New Jersey contends that portions of Congress' fiscal year 1994 lump-sum appropriation of over a billion dollars ($1,048,538,000) to the Attorney General for INS administration and enforcement should have been allocated to reimbursing New Jersey under  1365.  This appropriation was designated for "salaries and expenses."  Pub.L. No. 103-121, 107 Stat. 1160 (1993).

As a separate claim New Jersey also alleges violation of 8 U.S.C.  1330, which authorizes the Attorney General to recover fines, penalties and expenses from persons violating immigration laws.  The state does not allege that the Attorney General has failed to collect such monies; rather, it appears to contend that monies collected under this section should also be used by the United States to reimburse New Jersey.  Since this statute does not impose any such obligation on the federal government, presumably this claim is intended to be construed in conjunction with the state's other claims.

The district court held that plaintiffs' statutory claims are not subject to judicial review under the Administrative Procedures Act (APA), 5 U.S.C.  701, 702.  The APA waives the sovereign immunity of the United States and allows for judicial review of federal agency actions in certain circumstances.  5 U.S.C.  702.  Such review is not available, however, where such action "is committed to agency discretion by law."  Id.  701(a)(2).

In Lincoln v. Vigil, 113 S.Ct. 2024 (1993), on which the district court relied, the Court considered a challenge to a decision by the Indian Health Service to discontinue the Indian

Children's Program, which the Service had been providing for seven years but which was neither mandated nor specifically authorized by statute.  The relevant statutes spoke only in general terms, authorizing the Service to expend funds appropriated by Congress for "the benefit, care, and assistance of Indians" and for the "relief of distress and conservation of health."  113 S.Ct. at 2027-28 (quoting the Snyder Act, 25 U.S.C. 13).  The relevant appropriations acts did not mention the Indian Children's program.  Under these circumstances, the Supreme Court held that an agency's allocation of funds from a lump-sum appropriation is a decision "committed to agency discretion" and therefore unreviewable.

New Jersey argues that Lincoln is inapposite because 8 U.S.C. 1365, referred to above, is a specific statutory provision authorizing the appropriation it seeks.  However, the reimbursement authorized under that statute is qualified by the phrase, "[s]ubject to the amounts provided in advance in appropriation acts."  A general lump sum appropriation to the INS does not constitute a specific mandatory requirement of reimbursement.  Furthermore, Congress knows how to make an appropriation under 1365 if it wants to.  For fiscal year 1995 Congress made a specific appropriation of 130 million dollars for reimbursing states under 1365.  See Pub. L. No. 103-317, 108 Stat. 1724, 1778 (1994).

Accordingly, since none of the $1,048,538,000 lump sum appropriation for INS "salaries and expenses" nor the monies recovered under 1330 were earmarked by Congress in fiscal year 1994 for disbursement under 1365, the decision as to whether to appropriate any of those funds for that purpose is one "committed to agency discretion" and therefore unreviewable under the APA, 5 U.S.C. 701(a)(2).

Plaintiffs argue in their brief to this court that they are also entitled to relief under 8 U.S.C. 1252(i).  However, as this claim was not raised in the complaint, nor, apparently, in plaintiffs' briefs to the district court, it is not properly before this court.  Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994).

III.
CONCLUSION

For the foregoing reasons, we will affirm the order of the district court.